No. 25-4202

In The
# United States Court of Appeals for the Fourth Circuit

United States of America

*Appellee*

v.

Ryan E. Dales a/k/a Ryan Dales

*Appellant*

On Appeal from the United States
District Court for the District of
Maryland,
No. 1:23-cr-00026-GLR-1

## Brief for Appellant

Steven M. Klepper
KRAMON & GRAHAM, P.A.
750 East Pratt Street, Suite 1100
Baltimore, MD 21202
(410) 752-6030
sklepper@kg-law.com

*Appointed Counsel for Appellant*

# Table of Contents

Table of Contents .................................................................................ii

Table of Authorities.............................................................................v

Jurisdictional Statement......................................................................1

Issues Presented for Review ...............................................................1

Statement of the Case .........................................................................1

    1. December 2020 to June 2021: Dales resided at a halfway house........................................................................2

    2. December 2020 to September 2021: Dales allegedly made fraudulent applications for COVID-related benefits. ...................................................................................2

    3. January 2022: Dales moved to the Target Residence, where the Government was unable to surveil him..............3

    4. June 2022: The Government executed a search of the Google account listed in the benefit applications. ...............4

    5. November 2022: The Government executed warrants for three other Google accounts and three Apple accounts. ..............................................................................5

    6. January 13, 2023: The Court issued an arrest warrant on a criminal complaint for the alleged benefits fraud. .......6

    7. January 18, 2023: A warrant issued to search the entire residence, without connecting the agent's "training, knowledge, and experience" to the case's facts.................................................................................7

    8. January 20, 2023: The Government executed the warrant and discovered evidence of different crimes...........9

    9. May 2023: The grand jury delivered a superseding indictment...............................................................................10

    10. October 2023: Dales moved to suppress. ...........................10

    11. May 2024: The district court heard the motion.................11

        a. The Government argued probable cause that the phone would have information identical to the information already recovered from the cloud. ..............11

      b.  The district court saw "a little bit closer call than what would normally be the case" but denied the motion to suppress. ........................................................ 12

    12.  November 2024: The district court denied reconsideration. ................................................. 14

    13.  December 2024: Following bifurcation, a jury convicted Mr. Dales of drug and firearm charges. ............. 15

    14.  January 2025: Mr. Dales entered a conditional plea on wire fraud and aggravated identity theft, reserving his right to appeal the suppression ruling ........................... 15

Summary of Argument ........................................................... 16

Standard of Review ............................................................... 18

Argument ............................................................................ 19

  I.  The affidavit lacked probable cause to support a search of the Target Residence for evidence of the Target Offense. ........ 19

    A.  Searching a home requires a substantial likelihood that evidence of a particular crime will be found at that particular location. ..................................... 19

    B.  The Target Offense fell outside the recognized classes of cases that support inferences linking residences to crimes .......................................................... 23

    C.  Agt. Gorman's affidavit showed no substantial likelihood that searching the Target Residence would yield evidence of the Target Offense. ................................. 26

      1.  The affidavit identified no offenses, evidence, or IP addresses linked to the Target Residence. ................ 26

      2.  The phone-related facts did not supply probable cause to search the residence. ....................................... 36

      3.  Agt. Gorman offered only boilerplate speculation about what else might be in the Target Residence, not a substantial likelihood of evidence of the Target Offense. ......................................................... 41

      4.  The other images, not linked to the Target Offense and with no dates given, are a red herring. ................... 44

iii

II. The good-faith exception does not apply. .................................. 49

    A. Agt. Gorman's affidavit was replete with affirmative indications—not mere omissions—that there was manifest lack of probable cause. ......................................... 49

    B. *Lalor* does not support a finding of good faith here. .......... 54

    C. Suppression is important to deter warrants based on sophisticated affidavits that create an illusion of probable cause. ............................................................... 59

Conclusion ....................................................................................... 64

Statement Respecting Oral Argument ................................................. 65

Certificate of Compliance .................................................................. 66

Certificate of Service ........................................................... unnumbered

iv

# Table of Authorities

**Cases**

*Florida v. Jardines*, 569 U.S. 1 (2013) ............................................. 19, 60

*Franks v. Delaware,*  438 U.S. 154 (1978) .............................................. 60

*Illinois v. Gates*, 462 U.S. 213 (1983)...................................................... 38

*Pearson v. Callahan*, 555 U.S. 223 (2009) ............................................ 61

*Riley v. California*, 573 U.S. 373 (2014) ............................................ 32-36

*Rogers v. Jarrett*, 63 F.4th 971 (5th Cir. 2023)..................................... 61

*Silverman v. United States,* 365 U.S. 505 (1961) .................................. 19

*United States v. Allen*, 631 F.3d 164 (4th Cir. 2011)............................. 22

*United States v. Anderson*,
    851 F.2d 727 (4th Cir. 1988)....................................... 21-22, 45, 51, 55

*United States v. Bosyk*, 933 F.3d 319 (4th Cir. 2019)....................... 23-25

*United States v. Carpenter*, 360 F.3d 591 (6th Cir. 2004) ..................... 58

*United States v. Ebert*, 61 F.4th 394 (4th Cir. 2023).................. 20, 23, 25

*United States v. Feng Ling Liu*,
    2014 WL 101672 (S.D.N.Y. Jan. 10, 2014) ................................... 31-32

*United States v. Flores-Reyes*,
    2019 WL 7281951 (D. Md. Dec. 27, 2019) ......................................... 56

*United States v. Golestan, __ F.4th __,*
    2025 WL 2424577 (4th Cir. 2025) .................................................... 28

*United States v. Gonzales*, 399 F.3d 1225 (10th Cir. 2005).............. 54, 58

*United States v. Green*, 599 F.3d 360 (4th Cir. 2010)............................ 18

*United States v. Griffith*,
    867 F.3d 1265 (D.C. Cir. 2017) ........................... 34, 37, 41, 51, 57, 60

*United States v. Hernandez-Mendez*,
    626 F.3d 203 (4th Cir. 2010).............................................................. 18

*United States v. Krueger*, 145 F.4th 460 (4th Cir. 2025)................... 23-24

*United States v. Lalor*,
    996 F.2d 1578 (4th Cir. 1993)...................................... 21, 43-49, 54-56

*United States v. Leon,*
468 U.S. 897 (1984).................................................49-50, 54, 57-63

*United States v. Liberto,* 565 F. Supp. 3d 739 (D. Md. 2021) .................46

*United States v. Lyles,* 910 F.3d 787 (4th Cir. 2018) .............................19

*United States v. McCall,* 740 F.2d 1331 (4th Cir. 1984).........................20

*United States v. McKenzie-Gude,*
671 F.3d 452 (4th Cir. 2011).....................................................52-53, 56

*United States v. Mora,*
989 F.3d 794 (10th Cir. 2021)......................................31-44, 47-49, 60

*United States v. Njokem,*
2022 WL 17105172 (D. Md. Nov. 22, 2022).......................29-31, 53-54

*United States v. Orozco,* 41 F.4th 403 (4th Cir. 2022)...........................22

*United States v. Perez,* 393 F.3d 457 (4th Cir. 2004).............................59

*United States v. Richardson,* 607 F.3d 357 (4th Cir. 2010)...............21-25

*United States v. Rowland,* 145 F.3d 1194 (10th Cir. 1998).............. 35, 43

*United States v. Sanders,* 107 F.4th 234 (4th Cir. 2024) ............20, 23-24

*United States v. Suarez,* 906 F.2d 977 (4th Cir. 1990) ..........................55

*United States v. Sueiro,* 59 F.4th 132 (4th Cir. 2023) .................22-25, 37

*United States v. U.S. Dist. Court (Keith),* 407 U.S. 297 (1972) ..............19

*United States v. Wellman,* 663 F.3d 224 (4th Cir. 2011).......................22

*United States v. Wilhelm,* 80 F.3d 116 (4th Cir. 1996)......................59-61

*United States v. Williams,* 974 F.2d 480 (4th Cir. 1992).......................55

*Zurcher v. Stanford Daily,* 436 U.S. 547 (1978) ..................................21

## Constitutional Provisions, Statutes, and Rules

U.S. Const. amend. IV........................................................................27

18 U.S.C. § 1028A..............................................................................46

18 U.S.C. § 1343 .............................................................................7, 46

18 U.S.C. § 3231 .................................................................................1

28 U.S.C. § 1291 .................................................................................1

Fed. R. App. P. 4 ........................................................................ 1

Fed. R. Crim. P. 3 ...................................................................... 6

Fed. R. Crim. P. 4 ...................................................................... 7

Fed. R. Crim. P. 11 .................................................................. 16

Fed. R. Evid. 201 ..................................................................... 30

**Other Authorities**

Gov't Opp. Dfdt. Njokem Mot. Suppress Evid. & Statements,
*United States v. Njokem*, No. 1:21-cr-00338-RDB (D. Md.
filed May 10, 2022) ............................................................29-30

John M. Burkoff & Amy Burkoff Kelley, SEARCH WARRANT
LAW DESKBOOK................................................................. 20

Thomas Y. Davies, *Recovering the Original Fourth
Amendment*, 98 MICH. L. REV. 547 (1999) ......................... 19

## Jurisdictional Statement

The district court exercised subject-matter jurisdiction under 18 U.S.C. § 3231 over the federal criminal charges against Appellant Ryan E. Dales. JA37-52. It entered judgment on April 11, 2025. JA316. Mr. Dales appealed on April 9, 2025, after the district court orally announced the sentence. JA315. His notice of appeal is treated as filed on April 11, 2025, after the entry of judgment. Fed. R. App. P. 4(b)(2). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## Issues Presented for Review

1.      Did the district court err in finding there was probable cause to search the Target Residence for evidence of the Target Offense?

2.      Did the district court err in finding in the alternative that the good-faith exception applies?

## Statement of the Case

This appeal challenges a warrant that issued on January 18, 2023, to search Mr. Dales' residence at 900 East Fort Avenue, Apartment #537, Baltimore, Maryland ("Target Residence") for evidence of charges of wire fraud relating to government benefits ("Target Offense"). JA98, JA101-37. Special Agent Brian Gorman signed the affidavit in support of that warrant. JA126.

### 1. December 2020 to June 2021: Dales resided at a halfway house.

Mr. Dales was convicted of bank fraud and identity theft in 2017. JA108. For the final six months of his sentence, Mr. Dales "resided at a 'halfway house' operated by Volunteers of America (VOA) from approximately December 9, 2020, to June 4, 2021." JA108.

### 2. December 2020 to September 2021: Dales allegedly made fraudulent applications for COVID-related benefits.

Just after moving into the halfway house, Mr. Dales applied for Maryland unemployment benefits. JA109. The claim was denied. JA110. In July 2021, after leaving the halfway house, Mr. Dales reopened his claim to seek Pandemic Unemployment Assistance benefits. JA110. He supported that claim by uploading two tax documents. JA110. In August and September 2021, Maryland paid Mr. Dales $25,570 in backdated benefits. JA112. According to Agt. Gorman, Mr. Dales' documentation was false and increased his weekly benefits from $130 to $430. JA112. Mr. Dales listed his email address as theycallmedales@gmail.com in his applications. JA109-12. He listed his physical address at his parents' house in Gwynn Oak, Maryland. JA110-11.

In December 2020, Mr. Dales submitted an Economic Injury Disaster Loan application for " "Ryan Dales, d/b/a "Dales Drop Inc." to the Small Business Association. JA112. The application listed a 443-652-7684 phone number, an email address of theycallmedales@gmail.com, and a residence owned by Evelyn Dales in Windsor Mill, Maryland. JA112-13. The application contained alleged misrepresentations. JA113. The Small Business Association denied the application. JA114.

Mr. Dales submitted an online Paycheck Protection Program loan application to Cross River Bank, a Small Business Association lender, in March 2021. JA114. The application listed a 443-652-7684 phone number, an email address of theycallmedales@gmail.com, and a physical address at Mr. Dales' parents' home in Gwynn Oak, Maryland. JA114. He also uploaded documents showing an address in Hyattsville, Maryland. JA114. The application contained alleged misrepresentations. JA115. The loan did not close. JA115.

### 3. January 2022: Dales moved to the Target Residence, where the Government was unable to surveil him.

Mr. Dales signed a one-year lease for the Target Residence, an apartment at Anthem House, on January 22, 2022. JA119-20.

Anthem House's security prevented effective surveillance: "Attempts to surveil DALES entering or exiting the TARGET RESIDENCE were unsuccessful due to the high level of security and privacy at the premises." JA120. "A key fob is required to enter Anthem House … and is also required to access the elevator banks to the residential floors." JA120. "There are multiple entrance and exit points, to include interior stairwells and elevators that lead to an attached parking garage." JA120.

### 4. June 2022: The Government executed a search of the Google account listed in the benefit applications.

On June 22, 2022, then-Magistrate Judge Matthew Maddox issued a warrant for the "information associated with the GOOGLE account THEYCALLMEDALES@GMAIL.COM that is stored at premises owned, maintained, controlled, or operated by GOOGLE." JA158; *see* JA139. The search included all account information and all Google products— including Gmail, photos, Google Drive ("including Docs, Sheets and Slides"), and Google Location and Search History. JA159-61.

As Agt. Gorman would recount in his January 2023 affidavit, the account was registered to Mr. Dales with a recovery phone number of

443-652-7684. JA115. The search yielded emails with the Maryland Department of Labor regarding unemployment benefits. JA115.

**5. November 2022: The Government executed warrants for three other Google accounts and three Apple accounts.**

On November 10, 2022, then-Magistrate Judge Maddox issued two warrants, one directed to Google and the other to Apple. JA165, JA168. With the same breadth as the June warrant, the Google warrant was for three other accounts linked to Mr. Dales—Dalesbackup1@gmail.com; ryane.dales@gmail.com; and rocdello@gmail.com. JA201, JA203-05. The Apple warrant was for three accounts linked to the same three Gmail addresses. JA202. It required Apple to produce all "iCloud data existing on Apple's servers, including subscriber information, mail logs, and all iCloud content, including, but not limited to, email, photo stream, photo library, iCloud Drive, contacts, calendars, bookmarks, and Safari browsing history" and all "iOS device activation information and device backups, including photos and videos in the Camera Roll, device settings, app data, iMessage, SMS, and MMS messages and voicemail." JA208.

As Agt. Gorman's affidavit later recounted, Google produced information that Dalesbackup1@gmail.com was created the day after

Dales entered the halfway house in December 2020, with a recovery number of 443-652-7684. JA116. Apple produced information that all accounts were linked to 443-652-7684. JA117.

The iCloud records for Apple ID ryane.dales@gmail.com included images that, according to the Government, suggested creation of false identification documents. JA117-18. The Government supplied no information about those photographs' dates—either in the warrant application or in briefing—and the "Target Offense" in the January 2023 warrant was only wire fraud involving federal benefits. JA117-18; *see* JA75. The items from that iCloud account also included "pay stubs or earnings statements in several different names," including a "document dated September 1, 2020 … labeled as an Earnings Statement for DALES from a purported production company with a net pay of $20,660.76 and year-to-date net pay of $61,982.28," while Mr. Dales was incarcerated. JA118.

### 6. January 13, 2023: The Court issued an arrest warrant on a criminal complaint for the alleged benefits fraud.

One week before searching Mr. Dales' apartment, the Government filed a criminal complaint against him. JA15; *see* Fed. R. Crim. P. 3. It alleged that "[o]n or about the date(s) of December 15, 2020 … the

defendant(s) violated: 18 U.S.C. § 1343 Wire Fraud." JA15. The supporting affidavit recounted the alleged benefits fraud and the information recovered in prior searches. JA16-30. Then-Magistrate Judge Brendan Hurson authorized the complaint and arrest warrant. JA15; *see* Fed. R. Crim. P. 4(a).

> **7. January 18, 2023: A warrant issued to search the entire residence, without connecting the agent's "training, knowledge, and experience" to the case's facts.**

Three warrants issued on January 18:

1. "THE CELLULAR DEVICE ASSIGNED CALL NUMBER 443-652-7684 FURTHER DESCRIBED IN ATTACHMENT A-1," which "applie[d] to records and information" in the custody or control of T-Mobile USA Inc., not the physical device itself, JA93, JA127;

2. "THE ENTIRE PREMISES LOCATED AT 900 EAST FORT AVE., APT. 537, BALTIMORE, MARYLAND 21230," JA96; and

3. "THE PERSON OF RYAN DALES," JA98.

Agt. Gorman signed a single affidavit supporting all three warrants. JA101. He recited the facts supporting the allegations of benefits fraud, the June and November warrants, and the items recovered from those prior searches. JA108-21.

Key assertions and omissions included:

- residences were only examples of secure locations where fraudsters may keep evidence of their fraud, JA105;

- surveillance at the Target Residence failed because of the building's security measures, JA120;

- the contemporaneous warrant to T-Mobile was expected to yield, but had not yet yielded, surveillance opportunities and historic location data to identify other potentially locations of the crimes and evidence thereof, JA119;

- the only IP address connected with the Target Offense resolved to the halfway house in December 2020, JA109;

- the last specific date tied to the Target Offense was four months before Mr. Dales moved to the Target Residence, JA108-18;

- no dates were given for the images recovered as to possible identity theft, JA117-18;

- "everyone … carries their cellular telephone with them virtually everywhere they go," JA119; and

- the affidavit recited the Government's prior broad searches of the Apple and Google cloud accounts linked to the phone. JA115-18.

Magistrate Judge J. Mark Coulson signed all three requested warrants. JA92-99, JA126.

### 8. January 20, 2023: The Government executed the warrant and discovered evidence of different crimes.

When executing the residential warrant, "law enforcement identified two firearms (handguns), ammunition, and suspected Controlled Dangerous Substances (CDS), as well as suspected CDS packaging materials." JA216. Law enforcement also arrested Mr. Dales. JA215.

The Government applied for a further warrant to search the residence "out of an abundance of caution." JA216. Magistrate Judge Coulson approved the warrant. JA212. The Government seized: (1) two loaded firearms, one which was stolen and one which was a privately-made "ghost gun" Polymer80 firearm with no serial number; (2) numerous packages of fentanyl; (3) multiple digital scales, sifters, empty capsules, drug packing materials, and suspected cutting agents; (4) six mobile devices; (5) multiple computers; (6) an embosser and ID

card printer; (7) laminate sheets with security holograms; (8) gift cards in various denominations; (9) bulk packages of shrink-wrapped white PVC cards; and (10) three purported South Carolina identification cards containing personal identifying information of individual victims but Mr. Dales' photograph. JA70.

### 9. May 2023: The grand jury delivered a superseding indictment.

Four months later, a grand jury delivered a superseding indictment on charges of wire fraud for government benefits (the Target Offense); firearm possession by a prohibited person; fentanyl possession with intent to distribute; firearm possession in furtherance of drug trafficking; and wire fraud and aggravated identity theft to obtain merchandise. JA37-52.

### 10. October 2023: Dales moved to suppress.

Mr. Dales moved to suppress the evidence based on Fourth Amendment violations in October 2023. JA53. The Government opposed five months later. JA67. Its exhibits were the various warrants, applications, affidavits, and attachments. JA92-220. The Government submitted no extrinsic evidence to show unintentional omissions from the affidavits. JA6.

### 11. May 2024: The district court heard the motion.

#### a. The Government argued probable cause that the phone would have information identical to the information already recovered from the cloud.

At the hearing, Mr. Dales highlighted that the Government had no idea in January 2023 whether his phone was the same one he used from December 2020 September 2021. JA330. The Government responded by acknowledging it had reason to believe only that the device would have the same information the Government searched in 2022.

> iCloud is a cloud storage account. So with a cloud storage account, even if you have a new phone – counsel spent a lot of time talking about the potential for a new phone in the Defendant's hand. Even if you have a new phone, it backs up to the cloud. It backs up to the iCloud and the contents are able to be put on that phone; and the same goes for Google, which is an internet-based cloud account.

JA348.

As to the undated photos of suspected identity theft outside the Target Offense, the Government argued that "Defendant's phone, his phone number, was activated on December of 2020. Okay. So that phone that is linked to these iCloud accounts where this inculpatory information is contained was activated in December of 2020." JA349.

### b. The district court saw "a little bit closer call than what would normally be the case" but denied the motion to suppress.

The district court found there was probable cause to search the Target Residence:

> Within the confines of that warrant sought to search a cell phone associated based upon the affidavit that the Defendant used. This cell phone number used was associated with applications to obtain fraudulent information in which the Defendant was identified not only through the cell phone but also through his email addresses.
>
> The affiant asserts that proceeds or evidence of the cell phone would be found or the cell phone itself would be found at the residence based upon his training and experience, that not only is information contained on the cell phone manifesting criminal activity but that the cell phone itself is possessed or would be possessed by the individual Defendant.
>
> There's sufficient evidence within the affidavit itself that the cell phone was used by this Defendant at the location, although there is some time that did pass between the two alleged fraudulent acts. It's noteworthy that the Defendant was indeed on supervised release for a fraud-related crime and committed … at least one of these acts while he was on supervised release.
>
> Certainly temporal proximity, and temporal proximity, alone, is not sufficient for the purposes of establishing probable cause. But, nevertheless, the Defendant's use of the cell phone as part of the fraudulent scheme does support the finding of probable cause.
>
> Certainly the Court affords great deference given to the probable cause determination of the judge, and law enforcement may draw inferences based upon their

experiences. As indicated in this case, the Defendant allegedly used records are typically kept in residences. There was specific details of the fraud scheme and the Defendant's involvement in the use of his own identifying information. As indicated, the residence was linked through the phone. And as a result, there was a link between the phone and the Defendant's residence.

There was an assertion within the affidavit that the crime, if not direct and express, was ongoing. The Defendant was on supervised release for a fraud. He committed one fraud while in VOA and then within … what this Court considers a relatively short period of time, connected in another fraud. Evidence on his iCloud account manifested of purported fraudulent documents. And although the precise dates of those documents, which were not known, the time where they arrived on the iCloud account through the phone service of December of 2020 was known.

So it's not that far or that long a period of time between the existence of those incriminating items on the iCloud and the time of active service in the ongoing fraud which fails to support an ongoing scheme.

As indicated, the length of time is not the only factor in determining proper cause. You will need to look to all of the facts and circumstances. Certainly electronic devices, unlike maybe some other evidence such as narcotics, is not likely to be stale given the nature of the electronic storage. And … there's no evidence that this degrades quickly. This electronic device to commit and in connection with a criminal activity. Those devices or that device, including financial records, would be sought. The affiant indicated that financial also includes the iCloud account.

The warrant also sought records and other data on applications and IRS records. So it was … broader than just simply searching of an electronic device.

Looking at the nature of the unlawful activity, as indicated, the alleged activity – there's a suggestion that it was potentially ongoing because although there were periods of time where they're not manifested within the affidavit themselves, there are multiple periods of fraudulent activity that are ongoing.

When you look at … all of this in the totality of the circumstance, I believe that there is a demonstration that there was probable cause.

JA375-78.

The district court found, in the alternative, that the good-faith exception applied:

Certainly, this exception applies only [when] there is the most egregious conduct: A judge abandoned his judicial role, or where the warrant is so facially deficient the executing officer cannot reasonably presume it to be valid.

That's not the case here. *This is a little bit closer call than what would normally be the case.* But certainly I believe that the good faith exception to the warrant requirement would apply.

JA378 (emphasis added).

### 12. November 2024: The district court denied reconsideration.

Mr. Dales moved for reconsideration five months later. JA241. The Government directed defense counsel's attention to evidence from discovery, causing Mr. Dales to withdraw one of his arguments. JA255.

The Government also submitted evidence from discovery in a sur-reply.

JA294-97. The district court denied reconsideration:

> The gravamen of the Defendant's argument is that this Court improperly relied upon information related to fraud allegations occurring after the execution of the search warrant in question. This is incorrect. The Court relied upon information contained within the affidavit including but not limited to the use and/or ownership of the Defendant's cellphone in association with the residence searched. However there certainly appears to be implied or some evidence of other ongoing fraudulent activity in the affidavit referenced by the government.

JA285.

### 13. December 2024: Following bifurcation, a jury convicted Mr. Dales of drug and firearm charges.

The district court bifurcated the drug and firearm charges from the other charges. JA378-79. Following a five-day trial (JA9), a jury convicted Mr. Dales of possession of a firearm by a prohibited person, fentanyl possession with intent to distribute, and firearm possession in furtherance of drug trafficking. JA298-99.

### 14. January 2025: Mr. Dales entered a conditional plea on wire fraud and aggravated identity theft, reserving his right to appeal the suppression ruling.

Mr. Dales and the Government executed a conditional plea agreement as to wire fraud and aggravated identity theft:

Defendant knowingly waives all right … to appeal the Defendant's conviction as to Count Five and Eight on any ground whatsoever, except as follows: pursuant to Federal Rule of Criminal Procedure 11(a)(2), the Defendant reserves the right to appeal the district court's oral ruling denying his Motion to Suppress Evidence and Statements (ECF No. 48) …. Defendant's right to appeal this ruling as to Counts Two, Three, and Four of the Superseding Indictment has already been preserved in light of Defendant's decision to proceed to a jury trial in connection with these counts.

JA305.

The district court entered judgment on the five counts of conviction, sentencing Mr. Dales to 316 months' incarceration. JA316-17. The Government dismissed various counts, including the alleged benefits fraud that was the Target Offense. JA316; *see* JA32-34, JA38-40.

## Summary of Argument

**I.** Under established Fourth Amendment precedent, the affidavit showed no probable cause linking the Target Residence to the Target Crimes. The Fourth Amendment's primary purpose was to safeguard homes. Probable cause that a suspect committed a crime does not mean probable cause to search their residence. There must be a substantial likelihood that searching a particular home will yield evidence of a particular crime. Outside the child-pornography context, there is no natural inference that a defendant will commit a crime or have

16

recoverable evidence of that crime at their home—rather than any other place where crime may be committed. Rather than establish a nexus between the Target Offense and the Target Residence, Agt. Gorman's affidavit included a series of red flags that probable cause was lacking.

**II.** The good-faith exception does not apply because Agt. Gorman's affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. His affidavit duct-taped together points that were untethered to the Target Residence and, indeed, cut against a finding of probable cause. His affidavit offered residences as examples of places where fraudsters may commit fraud or keep evidence of fraud. Agt. Gorman recited investigators' inability to surveil the Target Residence. He expected that the contemporaneous T-Mobile warrant would provide surveillance opportunities and historic location data to identify other potential locations. He identified only one IP address, which resolved to the halfway house. The last specific date tied to the Target Offense was four months before Mr. Dales moved to the Target Residence. The affidavit recited that people carry their smartphones with them wherever they go, which cuts against probable cause for an open-ended residential search.

None of these defects was careless. The Court's case law on the good-faith exception has created a safe-harbor for the Government to submit extrinsic evidence to show oversights. Although the Government availed itself of that safe harbor on some points, it adduced no extrinsic evidence of good-faith on the points raised in this brief. And the Government acknowledged probable cause in 2023 only that Mr. Dales' smartphone would contain the same information the Government searched and seized in 2022. This case illustrates a recurring problem— sophisticated affiants using mobile phones and boilerplate as get-out-of-Fourth-Amendment-free cards. The good-faith exception does not apply, and suppression is necessary to preserve all citizens' privacy in their homes. The Court should reverse.

## Standard of Review

When reviewing a motion to suppress, this Court reviews legal questions de novo and factual questions for clear error. *United States v. Green*, 599 F.3d 360, 375 (4th Cir. 2010). The Court views the "evidence in the light most favorable to the Government." *United States v. Hernandez-Mendez*, 626 F.3d 203, 206 (4th Cir. 2010).

**Argument**

I. **The affidavit lacked probable cause to support a search of the Target Residence for evidence of the Target Offense.**

    A. **Searching a home requires a substantial likelihood that evidence of a particular crime will be found at that particular location.**

Homes enjoy special protection in Fourth Amendment jurisprudence. When "it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Silverman v. United States,* 365 U.S. 505, 511 (1961)).

"And 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *United States v. Lyles*, 910 F.3d 787, 793 (4th Cir. 2018) (quoting *United States v. U.S. Dist. Court (Keith)*, 407 U.S. 297, 313 (1972)). "The home's status flows from the common law, as the 'domicile was a sacrosanct interest in late eighteenth-century common law, as evidenced by the doctrine that a man's house is his castle.'" *Id.* (quoting Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 MICH. L. REV. 547, 642 & n.259 (1999)).

19

Supreme Court case law "poses a *two-part* inquiry for issuing magistrates: "(1) Is there probable cause to believe that the specific items being sought are evidence of criminal activity?; and (2) Is there probable cause to believe that this criminal evidence is presently located at the place specified in the warrant?" John M. Burkoff & Amy Burkoff Kelley, SEARCH WARRANT LAW DESKBOOK § 4:2. "This inquiry has proven to be particularly problematic when a search warrant is sought to search a person's home simply because that person is suspected of or known to have committed a crime." *Id.*; *see id.* at n.5 (collecting cases holding no nexus shown between offense and residence).

There "is no question that time is a crucial element of probable cause." *United States v. Sanders*, 107 F.4th 234, 251 (4th Cir. 2024) (quoting *United States v. McCall*, 740 F.2d 1331, 1335-36 (4th Cir. 1984)). "Consequently, part of a court's assessment of probable cause must consider whether the facts supporting it are 'so closely related to the time of the issu[ance] of the warrant as to justify a finding of probable cause at that time.'" *United States v. Ebert*, 61 F.4th 394, 401 (4th Cir. 2023) (quoting *McCall*, 740 F.2d at 1335-36). Still, "the existence of probable cause cannot be determined by simply counting the number of days

between the occurrence of the facts supplied and the issuance of the affidavit.'" *Id.* (quoting *United States v. Richardson,* 607 F.3d 357, 370 (4th Cir. 2010)). "Instead, the Court 'look[s] to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized.'" *Id.* (quoting *Richardson*, 607 F.3d at 357).

When "determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." *United States v. Lalor*, 996 F.2d 1578, 1582 (4th Cir. 1993) (citing *Zurcher v. Stanford Daily,* 436 U.S. 547, 556 & n.6 (1978)). Thus, "residential searches have been upheld only where some information links the criminal activity to the defendant's residence." *Id.* at 1583. Even when, for example, police have probable cause to believe that a defendant is a drug dealer, if "no evidence connects the drug activity to the residence, the courts have found the warrant defective." *Id.* "An affidavit must include sufficient "nexus between the place to be searched and the items

to be seized." *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988).

Although a "judicial officer need not demonstrate absolute certainty that devices containing evidence of a crime will be present in a defendant's home," the Fourth Amendment still requires a "'*substantial likelihood*' that evidence of a crime will be found in the place to be searched"—not a substantial possibility. *United States v. Sueiro*, 59 F.4th 132, 140 (4th Cir. 2023) (quoting *United States v. Allen*, 631 F.3d 164, 173 (4th Cir. 2011)) (emphasis in *Sueiro*). This inquiry looks to the "totality of the circumstances." *Id*. It is a "'practical, commonsense determination,'" including "'the normal inferences of where one would likely keep' the evidence sought." *Id*. (quoting *United States v. Orozco*, 41 F.4th 403, 409 (4th Cir. 2022)).

The "relevant question is whether the known facts and circumstances were sufficient such that a person of reasonable prudence could conclude that the described evidence would be found in that particular place." *United States v. Wellman*, 663 F.3d 224, 228 (4th Cir. 2011). In other words, the Fourth Amendment requires a "fair probability," *id*., not a fair possibility.

**B. The Target Offense fell outside the recognized classes of cases that support inferences linking residences to crimes.**

In most of this Court's precedents addressing residential searches for electronic equipment and data, the target offenses involved child pornography. *United States v. Krueger*, 145 F.4th 460, 464 (4th Cir. 2025); *Sanders*, 107 F.4th at 251; *Ebert*, 61 F.4th at 401; *Sueiro*, 59 F.4th at 140; *United States v. Bosyk*, 933 F.3d 319, 330 (4th Cir. 2019); *Richardson*, 607 F.3d at 370.

These cases have recognized "that probable cause is time-specific …. But when it comes to child sexual abuse material … the consensus among courts, including ours, is that 'even a substantial delay' between suspect online activity and the issuance of a search warrant 'doesn't render the underlying information stale.'" *Krueger*, 145 F.4th at 465 (quoting *Bosyk*, 933 F.3d at 330). Courts "evaluating warrants in such cases 'have sustained warrants issued many months, and even years, after the events that gave rise to probable cause.'" *Id.* (quoting *Bosyk*, 933 F.3d at 331).

The Court has identified "two primary reasons" for the special rules governing child-pornography cases. "First, there is the 'collector'

inference—the 'widespread view' that collectors of child sexual abuse material value that material highly, so rarely dispose of it and instead 'store it for long periods in a secure place, *typically in their homes*.'" *Krueger*, 145 F.4th at 465 (quoting *Bosyk*, 933 F.3d at 330) (emphasis added). That nexus, once established with a particular residence, does not dissipate just because months or years pass: "Second, there is the fact that 'digital media files persist for a long time,' [*Bosyk*, 933 F.3d] at 331, and that even if a defendant deletes a file 'from a hard drive or other computer media, a computer expert is still likely to retrieve … [it] through scientific examination of the computer.'" *Id.* (quoting *Richardson*, 607 F.3d at 371).

Even in child-pornography cases, the Court has cited specific information linking the residence to the target offense—far beyond anything in the affidavit here:

- In *Krueger*, "police officers observed illicit online activity at Krueger's residence." 145 F.4th at 462.

- In *Sanders*, the "Affidavit revealed that Sanders's IP address not only accessed a TOR hidden service … but had 'accessed

24

online child sexual abuse and exploitation material' using that site." 107 F.4th at 251;

- In *Ebert*, the 21-year-old victim reported that her father had taken sexually suggestive pictures and videos of her when she was a minor, including at the North Carolina home that police searched. 61 F.4th at 398.

- In *Sueiro*, "the affidavit contained information showing that Sueiro had committed the alleged crime by sending emails in the days before … the affidavit, that Sueiro rented a bedroom in the residence to be searched, and that Sueiro owned a computer that he kept in his bedroom." 59 F.4th at 140.

- In *Bosyk*, investigators knew that someone at an IP address downloaded four illicit videos, and "investigators connected the IP address to Bosyk's home." 933 F.3d at 323.

- In *Richardson*, AOL informed investigators of the transmission of illicit photos from an account linked to an address at a UPS store, which in turn was linked to the defendant's address. 607 F.3d at 361.

In sum, even when child pornography is involved, investigators still must establish probable cause that evidence of that crime was located at the particular residence in the first instance. Only then does the presumption arise—based on the "collector inference" and forensic recovery tools—that evidence would still be recoverable at the residence.

### C. Agt. Gorman's affidavit showed no substantial likelihood that searching the Target Residence would yield evidence of the Target Offense.

#### 1. The affidavit identified no offenses, evidence, or IP addresses linked to the Target Residence.

The January 2023 affidavit identified no act that took place at the Target Residence, or that took place after Mr. Dales began living there in January 2022. The only IP address identified in the affidavit resolved to the halfway house that Mr. Dales left in June 2021. The last date identified for any alleged false submission was in July 2021. The last date identified for any part of the Target Offense was the September 2021 receipt of benefits. No dates were supplied for any of the photos of the possible identity theft, which, in any event, was not the Target Offense.

Probable cause would therefore require a substantial likelihood that Mr. Dales brought evidence of the Target Offense with him when he moved to the Target Residence in January 2022. But the affidavit

identified no particular physical documents or electronic equipment that Mr. Dales was alleged to have used in the Target Offense, or that he brought with him when he moved to the Target Residence.

Unable to surveil the Target Residence, investigators did not know what was inside. They identified no particular physical evidence or electronic equipment that was probably at the residence. They did not know if Mr. Dales had the same mobile phone by January 2023, nor, by the Government's admission, did they have any reason to believe the physical phone had anything beyond what they recovered in prior searches.

Let's stop here for a moment and compare these facts to the Fourth Amendment's text:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. These facts fall far short of anything that could have been conceived as probable cause to search a residence in 1791.

When addressing crime in the internet age, this Court has still recited evidence, often an IP address, that is at least as reliable as

27

eyewitness testimony or surveillance to establish a nexus between the target offense and target residence. *Supra* § I.B. An "Internet Protocol (or IP) … address is a unique numeric label assigned to each device, such as a computer or smartphone, that connects to the Internet to send and receive information." *United States v. Golestan*, __ F.4th __, 2025 WL 2424577, at *1 (4th Cir. 2025).

Agt. Gorman's warrant identified only one IP address, which resolved to the halfway house in December 2020. He included no IP address that resolved to the Target Residence or to any smartphone linked to Mr. Dales. Nor did he cite anything else linking the Target Offense to the Target Residence. Instead, the Government offered arguments that collapsed on their own terms.

### a. The Government's Reliance on *Njokem* and *Feng Ling Liu*

In briefing and at the hearing, the Government focused on *United States v. Njokem,* 2022 WL 17105172 (D. Md. Nov. 22, 2022), which denied a motion to suppress a residential search for evidence of fraudulent electronic applications for pandemic-era unemployment benefits. JA79-80, JA353-56.

Mr. Dales' counsel happened to be defense counsel in *Njokem*, and he pointed out that "the loan applications in that case came from the IP address of Mr. Njokem's apartment." JA337. "This crime was committed somewhere else." JA338. Had the Government "searched [the halfway house] maybe they could have an argument that the records would still be there." JA338. "But there's nothing to suggest that the records would be at the Fort Avenue address other than the presence of Mr. Dales himself." JA338.

The Government responded that the *Njokem* "motion was substantially identical to the motion in this case," and that the *Njokem* "decision doesn't reference IP addresses at all." JA353-54. "What Judge Bennett is focused on in his decision is that it's the nature of the property sought, including financial records and debit and credit cards. And he says, quote, 'not the type that is ordinarily destroyed or moved.' So that principle is applicable here." JA354.

The Court may take judicial notice, however, that in *Njokem* the Government *literally* highlighted the affidavit's evidence that the IP address used to submit 15 claims resolved to the target residence:

31.  MD DOL records reflect that 15 UI claims were filed from IP address 73.173.201.29 between June 2, 2020 and June 27, 2020, collectively listing mailing addresses of

16707 Governors Bridge Road, Apt. 204; 5610 Hamilton Manor Drive, Apt. 1 and Apt. 4; 5810 Bell Station Road; 16703 Governors Bridge Road, Apt. 103; 5618 Hamilton Manor Drive, Apt. 6; 16513 Governors Bridge Road, Apt. 108; 2517 Baltimore Road, Apt. 5; and 16405 Governor Bridge Road, Apt. 102. The claims were filed using the names, B.M., C.M., G.C., D.M., D.B., E.W., M.G., K.P., S.J., J.D., L.T., M.J., N.J., L.T. and B.E.

32.    Commercial and government database searches conducted by law enforcement reveal that each of the 15 UI claims was filed in the identity of an individual who was unlikely to reside at the mailing address associated with their claim. Of particular note, on or about June 19, 2020, a claim was filed for G.C. listing a claimant mailing address of **TARGET PREMISES-1**. The email address listed for the application in the name of G.C. was Cruzglenda16@gmail.com. An open source database search showed that G.C. was deceased at the time the UI claim was filed.

33.    According to Comcast records, beginning March 25, 2020 and continuing through the period during which the 15 claims were filed, the subscriber for IP address 73.173.201.29 was **NJOKEM** with a mailing address of **TARGET PREMISES-1**. **NJOKEM's** Comcast account was still active as of January 8, 2021. The phone number listed on the account was 240-467-4944.

Exhibit 1 to Gov't Opp. Dfdt. Njokem Mot. Suppress Evid. & Statements, *United States v. Njokem*, No. 1:21-cr-00338-RDB (D. Md. filed May 10, 2022), at 11 (Government's highlights), *available at* https://ecf.mdd.usco urts.gov/doc1/093112451654; *see* Fed. R. Evid. 201(d).

Eight times, the Government's *Njokem* memorandum referenced the nexus that the affidavit established between the target residence's IP address and the target offenses. Gov't Opp., *Njokem*, at 3-4, 8-10, *available at* https://ecf.mdd.uscourts.gov/doc1/093112451653.

Thus, the *Njokem* opinion addressed only the nexus in time between the residence and the offense because that was the only objection the defendant raised or could have raised. By showing a direct nexus between the charged wire fraud and the target residence, the *Njokem* affidavit allowed only for a challenge whether the evidence linked to that particular location had grown stale in the intervening months. To be clear, the Government's counsel here was not the same as in *Njokem*, and the mischaracterization of *Njokem* appears unintentional. Still, this case illustrates the dangers of drawing broad principles from decisions, particularly unpublished, that do not delve deeply into the facts.

The Government also emphasized that the "*Feng Ling Liu* case" cited in its memorandum "was an asylum fraud case, and the same principle with respect to staleness and electronic evidence was applied there." JA353. That decision, however, found probable cause to search a law office when cooperating witnesses "'informed [the affiant] of evidence of the scheme likely to be found at the [office],'" including that they "'used the computer[s] at [their] desk[s]' at the firm 'to write false persecution stories for clients seeking asylum.'" *United States v. Feng Ling Liu*, 2014

WL 101672, at \*4 (S.D.N.Y. Jan. 10, 2014). There was direct eyewitness testimony of evidence at the target location.

The Government's efforts to establish probable cause through cases decided outside the child-pornography context—or, indeed, cases decided in the child-pornography context—underscore Agt. Gorman's complete failure to link the Target Residence to the Target Offense.

### b. The Persuasive *Mora* Decision

A common theme in Fourth Amendment jurisprudence is a reluctance to second-guess how police and magistrates conduct their daily work on the ground. For that reason, we highlight the persuasive force of *United States v. Mora*, 989 F.3d 794, 801 (10th Cir. 2021). Its author, Judge Joel M. Carson III, served as a part-time United States Magistrate Judge during the years (2015-2018) after the seminal decision in *Riley v. California*, 573 U.S. 373 (2014). Few federal appellate judges are former magistrate judges, much less with significant post-*Riley* experience reviewing and approving warrants.

*Mora* involved a residential search for evidence of alien smuggling. Although alien smuggling is not an inherently electronic offense, *Mora* gives a roadmap for addressing overbroad Government allegations that

a residence is likely to have evidence of a crime. In particular, the case shows the absurdity of the Government claiming probable cause to search a residence for a cell phone when the Government has already secured the phone (or, in this case, all relevant evidence likely on the phone).

*Mora* began by observing, consistent with this Court's precedent, that whether "a nexus exists to search a suspect's home depends on the strength of the case-specific evidence that links suspected criminal activity and the home." 989 F.3d at 800.

Staying focused on this inquiry, *Mora* held that although "the totality of the circumstances established probable cause that Defendant engaged in alien smuggling, the government failed to articulate how evidence of alien smuggling justified the search of his home." 989 F.3d at 801. Just as the Government here relies on child-pornography cases, the Government in *Mora* relied on drug trafficking cases: "Despite the government's reliance on drug trafficking cases, alien smuggling is not part of that special class where we have held that probable cause that a defendant committed the crime suggests the concealment of evidence in the home." *Id*.

Similar to Agt. Gorman, the *Mora* "affiant stated, based on his training and experience, that alien smugglers often use electronic communication devices, GPS devices, and electronic banking systems to conduct operations and store records." 989 F.3d at 801. As with Agt. Gorman, "[n]one of those boilerplate statements, however, [was] specific to Defendant's crime or circumstances." *Id.*

The *Mora* decision noted the limits on reasonable inferences as to mobile phones: "Even if Defendant used a GPS, online banking, or other means of electronic record-keeping for his alien smuggling operation, we could reasonably infer that he did so on a cell phone." 989 F.3d at 802 (citing *Riley*, 573 U.S. at 395). "But the assumption that a suspect maintains illicit records on a cell phone does 'not automatically justify an open-ended warrant to search a home anytime officers seek a person's phone.'" *Id.* (quoting *United States v. Griffith*, 867 F.3d 1265, 1273 (D.C. Cir. 2017)). "Instead, such a search would rest on a second assumption: that the person (and his cell phone) would be home." *Id.* (quoting *Griffith*, 867 F.3d at 1273). Most people keep their smart phones within five feet of them, rather than leaving them at home. *Id.*

Of particular relevance here, *Mora* noted that, before the Government secured the warrant to search the residence, it had already secured the phone. 989 F.3d at 802 (defendant arrested outside home). Further, investigators could have, but did not yet, search a tractor trailer cab that the affidavit linked to the offense. *Id.* at 802-03.

As for the other items that the *Mora* affidavit suggested might be in the residence, the Fourth Amendment required "more than an affiant's bare assertions that criminals typically store evidence in their home without corroborating evidence to uphold the constitutionality of a search." *Mora*, 989 F.3d at 802-03 (quoting *United States v. Rowland*, 145 F.3d 1194, 1204 (10th Cir. 1998) (rejecting "logical inference" that a suspect would store contraband at his home where no information suggested the suspect "previously transported contraband … to his home or that he had previously stored contraband at his home")). Courts "cannot rely on the home-storage inference where the home 'was but one of an otherwise unlimited possible sites for viewing or storage' and the 'affidavit provided no basis to either limit the possible sites or suggest that [the defendant's] home was more likely than the otherwise endless possibilities.'" *Id.* at 803 (quoting *Rowland*, 145 F.3d at 1204).

On all points, *Mora*'s authoring judge wrote from a place of on-the-ground experience as a magistrate judge reviewing affidavits and issuing (or declining to issue) warrants in the post-*Riley* regime.

### 2. The phone-related facts did not supply probable cause to search the residence.

The Government's argument turned mainly on Mr. Dales' mobile phone. JA74-76. And the district court's ruling relied almost entirely on the mobile phone. JA375-78.

Responding to the Government's theory, Mr. Dales noted, among other things:

a. it is common knowledge that consumers regularly upgrade their physical phones while keeping the same telephone number;

b. the Government had no idea in January 2023 whether Mr. Dales still had the same physical phone as in September 2021;

c. the Government had recovered any relevant data through its prior searches of his Apple and Google cloud accounts; and

d. the only IP address linked to the Target Offense resolved to the halfway house that Mr. Dales left in June 2021, not to the Target Residence.

JA329-31, JA337.

Rather than deny these points, the Government embraced them. It declared that the physical phone—whether or not the same phone as in September 2021—was likely to have exactly the same information already recovered in the 2022 cloud searches. JA348.

A search for a cell phone is already a thin reed to search an entire residence, and these undisputed facts push this case far past the breaking point. This Court, citing the same D.C. Circuit authority the Tenth Circuit cited in *Mora* (*supra* § I.C.1.b), has rejected "the proposition that the ubiquity of cell phones, *standing alone*, can justify a sweeping search for such a device." *Sueiro*, 59 F.4th at 141 (discussing *Griffith*, 867 F.3d at 1268, involving a getaway driver).

The ubiquity of cell phones did not "stand alone" in *Sueiro*, which was a child-pornography case, because the defendant "allegedly committed the crime using an electronic communications device just days before the magistrate judge issued the initial warrant." *Id.* And the affiant presented evidence that the defendant owned a computer and was living in the target residence when he sent those emails in the days before the search. *Id.* at 140. *Sueiro* thus rejected a challenge that the warrant was overbroad simply because it included electronic devices other than

the computer known to be in the residence at the time of the crime. *Id.* at 141. "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).

By contrast, the Government had already searched Apple and Google accounts associated with Mr. Dales' mobile telephone number and recovered the only evidence it expected to find in searching the phone. No IP address was linked to the phone, and the Government did not assert that Mr. Dales used the phone to submit the applications under investigation. Rather, the affidavit asserted that Mr. Dales listed the phone number in applying for benefits, and that after moving to the Target Residence he still had the same phone number, which was linked to the already-searched cloud accounts.

In that respect, this case is similar to *Mora*, but stronger. There, officers had taken possession of the phone but had yet to search the phone before applying for a warrant to search the residence. 989 F.3d at 802. But when Agt. Gorman applied for a warrant to search the Target Residence, the Government had already searched the cloud for anything relevant it could have accessed through the phone.

Also like *Mora*, the affidavit highlighted the steps the police could have taken, but did not take, to try developing probable cause to search the residence. In *Mora*, the officers did not search the trailer they had connected to the offense. 989 F.3d at 802-03. Agt. Gorman's affidavit supported two other warrants that Judge Colson simultaneously issued. One warrant, directed to T-Mobile, prospectively secured for a 45-day period a wide range of call data, including plus "GPS data" and "Latitude-longitude data" for the device associated with Mr. Dales' telephone number; along with data on calls from December 2020 onward. JA131-32. The warrant required T-Mobile to "furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information … including by initiating a signal to determine the location of the TARGET TELEPHONE on T-Mobile's network or with such other reference points as may be reasonably available." JA132.

After unsuccessful efforts to surveil Mr. Dales at his residence, the Government could have used the information from the T-Mobile warrant to track Mr. Dales' movements, see if he was transporting material, and build a case for probable cause that evidence of the Target Offense

(i) existed at some physical location; and (ii) that location was Mr. Dales'

residence. Agt. Gorman specifically told Judge Colson:

> [T]he requested historical records will enable investigators to identify location information and patterns of life associated with DALES. The requested information will also allow law enforcement to identify general areas where DALES frequents, and aid in the identification of residences or other locations where DALES resides, spends time, or stores property. Additionally, historical records will assist investigators in determining the locations where DALES frequented in, and around the time the fraudulent claim and loan applications were submitted.
>
> Additionally, the prospective GPS "pings" (carrier provided location-based services, described further below) will assist law enforcement by providing real-time location updates for the TARGET TELEPHONE. This information will assist law enforcement in effecting the arrest of DALES, as well as provide additional evidence relevant to this ongoing investigation as mentioned above. This is particularly so because, based on my knowledge, training, and experience, nearly everyone has a cellular telephone and carries their cellular telephone with them virtually everywhere they go.

JA119.

That final sentence—that "nearly everyone … carries their cellular

telephone with them virtually everywhere they go" (*id.*)—brings us to the

third warrant Magistrate Judge Colson issued based on the same

affidavit: to search "THE PERSON OF RYAN DALES." JA98. As the

affidavit explained, Agt. Gorman expected that the phone would be on

Mr. Dales' person, and that location information would therefore aid in

executing the previously issued arrest warrant. JA119. Precisely because the established inference is that a person carries their mobile phone with them at all times, a warrant to search a residence is ordinarily not the proper way to secure a mobile phone; a search of a person is the means targeted to that end. *Mora*, 989 F.3d at 802; *Griffith*, 867 F.3d at 1273.

Rather than establish a nexus between the Target Residence and the Target Offense sufficient to support a search, Agt. Gorman's statements about the mobile phone negated such an inference.

### 3. Agt. Gorman offered only boilerplate speculation about what else might be in the Target Residence, not a substantial likelihood of evidence of the Target Offense.

Agt. Gorman's affidavit showed he had no idea what was reasonably likely to be inside the Target Residence. His boilerplate statements about his "knowledge, training, and experience" under "INTRODUCTION AND AGENT BACKGROUND" bore no connection to this particular case. Removing statements related to already-searched cloud accounts, the relevant assertions included:

- "Individuals who participate in criminal activity, including wire fraud, frequently utilize computers and cellular telephones to commit their crimes," while offering no reason

to believe a computer was used in the Target Offense or located in the Target Residence;

- "[I]t is common for offenders to secrete records of fraud, amounts of currency, and financial instruments in secure locations within residences, including in combination or key-lock safes or strong boxes, suitcases, locked cabinets, and other types of locked or closed containers," while offering no reason to believe such paper records existed or that such containers or paper records were in the Target Residence;

- "[S]uspects who commit fraud amass proceeds from their crimes and attempt to legitimize those proceeds, and to accomplish this goal, utilize domestic banks and their attendant services, securities, cashier's checks, electronic money transfer services, or prepaid credit or debit cards, and that offenders commonly keep records of these transactions in *secure locations like residences*," while offering no reason to believe that these records existed in any particular place, much less the Target Residence.

JA104-05 (emphasis added).

The "secure locations like residences" language confirmed a point implicit in all of Agt. Gorman's statements of his knowledge, training, and experience. Outside the peculiar context of child pornography, there is no reason to conclude that suspect's residence is the particular place where the suspect is likely to keep evidence of a crime. The Government "cannot rely on the home-storage inference where the home 'was but one of an otherwise unlimited possible sites for viewing or storage' and the 'affidavit provided no basis to either limit the possible sites or suggest that [the defendant's] home was more likely than the otherwise endless possibilities.'" *Mora*, 989 F.3d at 803 (quoting *Rowland*, 145 F.3d at 1204).

The inquiry is not whether there was probable cause that Mr. Dales committed the Target Offense, but whether information linked the Target Offense to the Target Residence, with a fair probability that the search would yield particular evidence of the Target Offense. *Lalor*, 996 F.2d at 1582. The affidavit falls far short of that standard.

"Allowing officers to search a home based solely on an affiant's experience and pure speculation would perpetuate [the] evil" against which the Fourth Amendment protects us. *Mora*, 989 F.3d at 800. As in

*Mora*, an "affiant's general assertions about the tools of the trade are not enough to establish the requisite nexus." *Id.* at 803. "To hold otherwise would continue to erode the plain meaning of the Fourth Amendment by nullifying the longstanding principle that probable cause of a crime does not amount to probable cause to search the suspect's home." *Id.*; *see Lalor*, 996 F.2d at 1582.

### 4. The other images, not linked to the Target Offense and with no dates given, are a red herring.

When the affidavit described other photos found in 2022, without linking them to the Target Offense or giving any dates, Agt. Gorman dug a deeper hole rather than building probable cause. Three paragraphs of Agt. Gorman's affidavit identified items recovered in the November 2022 cloud search:

65. A review of iCloud records for Apple ID ryane.dales@gmail.com revealed dozens of driver's license or mug-shot style photographs of individuals who were not DALES. Several of these photographs were also found on separate images of Driver's Licenses or State Identification (ID) cards. Some of the ID cards contained the same photo, but different Personally Identifiable Information (PII) listed on the ID.

66. For example, the search warrant results included a single image of an unknown black male wearing a gray zip-up hoodie in front of a solid off-white background. Your Affiant has located the same image in at least four other identification documents: three Maryland Driver's

Licenses and one South Carolina Driver's License, all containing different PII. Queries with the Maryland Motor Vehicle Administration (MVA) indicated the PII on one of the Maryland licenses belonged to a white male who was 6'1" and 200lbs, not the black male pictured and listed as 5'8" and 163lbs. The second Maryland License did not return any results when the Driver's License number was queried with the MVA, indicating it may be fictitious. The third Maryland Driver's license with the same photo listed DALES's name and date of birth, although it is not believed that the photo is of DALES.

67. Your Affiant and other law enforcement personnel also found images linked to Apple ID ryane.dales@gmail.com of pay stubs or earnings statements in several different names. A document dated September 1, 2020, was labeled as an Earnings Statement for DALES from a purported production company with a net pay of $20,660.76 and year-to-date net pay of $61,982.28.7 As referenced above, DALES was released from the Bureau of Prisons and resided at a halfway house beginning on December 9, 2020.

JA117-18. Paragraph 67 included a date—which fell long before Mr. Dales moved to the Target Residence—while paragraphs 65 and 66 provided no such information.

Federal investigators in this Circuit have long known their affidavits must include relevant dates, particularly when offered to show that criminal activity is ongoing. The Court "has already cautioned the police about the need to specify time periods in warrant applications." *Lalor*, 996 F.2d at 1582 (citing *Anderson*, 851 F.2d at 729-30 & n.1).

This omission of dates from ¶¶ 65 and 66 jumps off the page, because it is well-known that electronic images are replete with metadata, including date, time, and location. *See, e.g.*, *United States v. Liberto*, 565 F. Supp. 3d 739, 742-43 (D. Md. 2021). Indeed, when the Government applied for the 2022 warrants that recovered the photos identified in ¶¶ 65 and 66, the affidavit stated that electronic "documents, and photos and videos" include the "data associated with the foregoing, such as geolocation, date and time." JA173; *see* JA144.

The images were not even part of the Target Offense. As the affidavit recited, Agt. Gorman was "conducting an investigation of Ryan Dales ('DALES') concerning fraudulent benefits involving Unemployment Insurance ('UI'), the Paycheck Protection Program ('PPP') and Economic Injury Disaster Loan ('EIDL') program." JA101. The Target Offense was Wire Fraud (18 U.S.C. § 1343), described to match those same assertions of fraudulent benefit applications. JA95, JA105, JA108-15. Although the affidavit recited Mr. Dales' 2017 conviction for Aggravated Identity Theft under 18 U.S.C. § 1028A(a)(1), identity theft was not part of the Target Offense. JA108. Nothing linked the identification materials to the benefit applications. JA333.

The overarching issue was that the affidavit created no nexus between any illegal activity (the charged wire fraud or even the uncharged identity theft) and the Target Residence. JA334. Nothing connected the materials depicted in the images with the Target Residence where any such illegal conduct was occurring. *Lalor*, 996 F.2d at 1582; *Mora*, 989 F.3d at 800.

On these points, the Government again embraced the holes in Agt. Gorman's affidavit:

> And then, and Your Honor was attuned to this earlier, there are the bogus identification cards found in his iCloud account … [T]hose are referenced, again, in the affidavit submitted by Agent Gorman. I will acknowledge that we did not include and, frankly, *I don't know if we had, metadata in terms of when those photographs were taken. But we know, we know that it was at least in December of 2020* because the phone number linked to that iCloud account was … activated in December 2020.
>
> From the Government's perspective, that *establishes a lengthy pattern of activity spanning back to this Defendant's past … convictions for bank fraud and aggravated identity theft*. So all of this is to say, Your Honor, there was a substantial basis for Judge Coulson to sign off on that warrant and conclude that probable cause existed.

JA355-56 (emphasis added).

The Government's basic argument was that Mr. Dales was generally up to no good, going beyond the crimes under investigation, and

that the Government thought a search of his apartment would help it figure out what he was up to. Those points resonated with the district court, which found that there "was an assertion within the affidavit that the crime, if not direct and express, was ongoing," and that "although the precise dates of those documents, which were not known, the time where they arrived on the iCloud account through the phone service of December of 2020 was known." JA377.

The district court highlighted the extent of its error in its final factual finding: "Looking at the nature of the unlawful activity … there's a suggestion that it was potentially ongoing because although there were periods of time where they're not manifested within the affidavit themselves, there are multiple periods of fraudulent activity that are ongoing." JA378; *see also* JA285 (clarifying that district court was not relying on later-filed charges but that "there certainly appear[ed] to be implied or some evidence of other ongoing fraudulent activity in the affidavit referenced by the government").

Agt. Gorman's affidavit indeed made no more than "a suggestion" that unlawful activity "was potentially ongoing," during "periods of time" that were "not manifested within the affidavit themselves." JA378.

And therein lay the clear-cut Fourth Amendment violation. Suggestions of potentially ongoing unlawful activity do not rise to a fair probability or substantial likelihood that a search of a particular residence will yield evidence of the crime under investigation at the time of the search. Again, "the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched," and "residential searches have been upheld only where some information links the criminal activity to the defendant's residence." *Lalor*, 996 F.2d at 1582-83.

There was no Fourth Amendment nexus with the Target Residence, as opposed to any other place where unlawful conduct could have occurred or evidence could have been recovered. *Lalor*, 996 F.2d at 1582; *Mora*, 989 F.3d at 803. There was no probable cause to search the Target Residence.

## II.   The good-faith exception does not apply.

### A. Agt. Gorman's affidavit was replete with affirmative indications—not mere omissions—that there was manifest lack of probable cause.

The Government in the alternative invoked the "good faith" doctrine under *United States v. Leon*, 468 U.S. 897 (1984).

"Suppression … remains an appropriate remedy" under *Leon* when an affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923 (citation omitted).

According to the Government, *Leon* applies because "the facts in the Affidavit clearly establish probable cause that evidence related to Wire Fraud would be found at the location to be searched—Defendant's residence." JA83.

The affidavit here did no such thing. As to the Target Residence, the affidavit established that Mr. Dales lived there for one year, and that, at least when inside the apartment, had a mobile phone with the same number he had used since December 2020.

Rather than mere silence, Agt. Gorman's affidavit supplied facts that amounted to a confession that investigators were merely speculating what they might find by searching the Target Residence:

- residences were only examples of secure locations where fraudsters may keep records, JA104;

- surveillance at the Target Residence failed because of the building's security measures, JA120;

- the contemporaneous T-Mobile warrant was expected to yield, but had not yet yielded, surveillance opportunities and historic location data to identify other potential locations of the crimes and evidence thereof, JA119;

- the only IP address connected with the Target Offense resolved to the halfway house in December 2020, JA109;

- the last specific date tied to the Target Offense was four months before Mr. Dales moved to the Target Residence, JA108-18;

- contrary to *Anderson*, 851 F.2d at 729-30 & n.1, the allusions to other activity included no dates, JA117-18;

- the affidavit recited that "everyone … carries their cellular telephone with them virtually everywhere they go," JA119, which cuts against probable cause and *even good faith* to use a cell phone as the predicate for an open-ended residential search, *Griffith*, 867 F.3d at 1273; and

- even worse for the Government than in *Griffith*, the affidavit supported a separate warrant to search Mr. Dales' person, including for the physical phone, while also reciting the

Government's prior broad searches of the Apple and Google cloud accounts linked to the phone. JA98-99, JA115-18.

These deficiencies were not mere silence, but objective red flags to the magistrate judge and law enforcement that this affidavit was peculiarly lacking in probable cause to support a warrant to search a residence.

From there, the Government's concessions and omissions in opposing suppression further confirmed the lack of even arguable good faith.

First, as to the above points, the Government proffered no extrinsic evidence to show unintentional omissions. The Government may introduce record evidence that the officers "who swore out the affidavit and executed the search" were "relying on uncontroverted facts known to them but inadvertently not presented to the magistrate." *United States v. McKenzie-Gude*, 671 F.3d 452, 460 (4th Cir. 2011). After Mr. Dales challenged the Government to provide any 2022 dates for the images or any connection to the Target Offense—three weeks before the hearing (JA224)—the Government stood pat. JA355 ("I will acknowledge that we did not include and, frankly, I don't know if we had, metadata in terms

of when those photographs were taken. But … we know that it was at least in December of 2020[.]”). By contrast, when Mr. Dales later moved for reconsideration, based in part on a lack of evidence of an IP address resolving to the halfway house, the Government pointed to a single page among 38,000 pages of discovery, and defense counsel promptly withdrew that argument because *McKenzie-Gude* foreclosed it. JA253-55. The Government did not avail itself of the *McKenzie-Gude* safe harbor to establish a nexus with the Target Residence.

Second, the Government at the hearing acknowledged that a search of the phone was reasonably likely to contain the same information the Government already retrieved through the 2022 cloud searches. JA348.

Third, the Government relied mostly on case law expressly relying on inferences peculiar to child pornography; and even those cases have involved affidavit testimony directly linking the residences to activity and (as a result) likely recoverable evidence at the target premises. *Supra* § I.B.

Fourth, and most striking, the Government’s reliance on *Njokem* shows that an investigator in Agt. Gorman’s position objectively knows how to meet the nexus requirement in an investigation for electronic

benefits fraud. *Supra* § I.C.1.a. The *Njokem* affidavit linked 15 benefit applications to an IP address that resolved to the searched residence. *Id.* The *Njokem* affiant was a Postal Inspector with the U.S. Postal Service investigating COVID benefits fraud in February 2021; Agt. Gorman was a Special Agent with the U.S. Postal Service Office of the Inspector General from April 2020 to July 2022. JA102. Comparing the *Njokem* affidavit to the affidavit here, Agt. Gorman's speculation is manifest.

In other words, the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923. Suppression is warranted because "reasonably well-trained officers, exercising their own professional judgment," could "recognize the deficiency" in establishing even "a minimal nexus between the place to be searched and the suspected criminal activity." *United States v. Gonzales*, 399 F.3d 1225, 1231 (10th Cir. 2005).

### B. *Lalor* does not support a finding of good faith here.

Beyond trying to distinguish *Lalor*, the Government argued that *Lalor* "found that evidence should not be suppressed because the good faith exception applied," and therefore that "even if Your Honor were to

find that the information that supported probable cause was stale, the good faith exception would still apply in this case." JA362.

*Lalor*'s context shows otherwise, and it does not support the Government's argument. As the Court noted in that 1993 decision, the Court had recently adopted the governing test, amid a split among circuits, that "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." 996 F.2d at 1582 (quoting *Anderson*, 851 F.2d at 729 (murder investigation)). And in the five years between *Anderson* and *Lalor*, this Court upheld a warrant to search a drug dealers' residences based on circumstantial inferences. *Id.* at 1583 (citing *United States v. Suarez*, 906 F.2d 977, 984-85 (4th Cir. 1990), and *United States v. Williams*, 974 F.2d 480, 481-82 (4th Cir. 1992)). *Lalor* described how the affidavit fell just short of those marks by failing to state, for example, the geographic proximity between the drug-dealing site and the residence. *Id.* at 1582.

After *Lalor*, the Court adopted a procedure for the Government to show good faith in the case of an innocent omission. The Government may introduce record evidence that the  officers "who swore out the affidavit

and executed the search" were "relying on uncontroverted facts known to them but inadvertently not presented to the magistrate." *McKenzie-Gude*, 671 F.3d at 460.

Against this backdrop of long-established case law, when a warrant establishes no nexus under *Lalor*, and when the Government introduces no evidence of unintentionally omitted information that would fill that gap under *McKenzie-Gude*, the good-faith exception does not apply. *See United States v. Flores-Reyes*, 2019 WL 7281951, at *7 (D. Md. Dec. 27, 2019) ("[I]n stark contrast to *McKenzie-Gude*, where the uncontroverted but missing fact was merely the address of the place to be searched, *no facts* of drug dealing support that probable cause existed for the place ultimately searched, even when crediting the 'omitted' information.") (citing *Lalor*, 996 F.2d at 1582).

Nor does it help the Government that the district court found probable cause here.[1] *See Lalor*, 996 F.2d at 1583 ("Indeed, two judicial

---

[1] Indeed, the Court in *Lalor* was dubious whether the defendant had even raised the nexus issue with the district court, and the Court addressed the nexus only because the Government conceded preservation. *Lalor*, 996 F.2d at 1582. Mr. Dales' briefing made clear he was arguing, in addition to staleness, that the affidavit drew no nexus at all with the Target Residence (a point reinforced by the affidavit's pre-January 2022 dates). JA230-31 (citing *Lalor*). The district court's

officers have determined that the affidavit provided probable cause to search.") (citing *Leon*, 468 U.S. at 926). The district court's findings of probable cause and good faith were in the same breath, acknowledging "[t]his is a little bit closer call than what would normally be the case. But certainly I believe that the good faith exception to the warrant requirement would apply." JA378. As part of that "closer call," the district court relied mainly on probable cause to search for the residence for the phone, without addressing the Government's express acknowledgment that the physical phone was likely to have the same files already recovered in the cloud searches. JA375-76; *see* JA348. And, for purposes of the good-faith doctrine, not just probable cause, the D.C. Circuit has held that a search for a cell phone may support a search as part of an arrest, not a sweeping residential search. *Griffith*, 867 F.3d at 1273. The rest of the probable-cause finding turned on the "assertion within the affidavit that the crime, if not direct and express, was ongoing." JA377. The district court resolved that question with a fundamentally erroneous legal standard, finding "a suggestion that it was potentially ongoing

---

summary of the parties' arguments reflected that nuance, JA326, and Mr. Dales squarely argued it throughout the hearing. JA336, JA343; *see* JA360-61 (responding to Mr. Dales' "nexus" arguments on the merits).

because although there were periods of time where they're not manifested within the affidavit themselves, there are multiple periods of fraudulent activity that are ongoing." JA378.

As the nexus requirement has become firmly established over the last three decades, courts have moved toward a more refined, judicially manageable good-faith inquiry that asks whether the "affidavit established 'a minimally sufficient nexus between the illegal activity and the place to be searched.'" *Gonzales*, 399 F.3d at 1230 (quoting *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004) (en banc)).

The nexus here was not even "minimally sufficient." It established only that Mr. Dales lived at the Target Residence, that there was probable cause he had committed benefits fraud on dates before he lived there, and that he had a cell phone with the same number with access to cloud accounts the Government already searched. Everything beyond that was speculation, replete with red flags. *Supra* § II.A.

Investigators, just like the criminal suspects they investigate, are charged with knowledge of the law governing their behavior. *Gonzales*, 399 F.3d at 1330 (citing *Leon,* 468 U.S. at 919 n.20). The purported nexus here fell well below anything the Government cited, even child-

pornography cases. Supra § I.B-C. In sum, a "reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 923 n.23.

### C. Suppression is important to deter warrants based on sophisticated affidavits that create an illusion of probable cause.

Counsel believes it important to acknowledge three elephants in the room. First, it is rare for the Court to hold that a defective warrant fell below the good-faith floor. The most commonly cited instance is *United States v. Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996), which rejected a "bare bones" affidavit that used subjective labels to vouch for a confidential informant without providing information that would allow a magistrate to make an objective finding of probable cause. A review of this Court's decisions citing *Wilhelm* have emphasized that the decision remedied a particular recurring problem that this Court and other circuits observed with affidavits using confidential informants with no indicia of reliability. *E.g.*, *United States v. Perez*, 393 F.3d 457, 464 (4th Cir. 2004).

Another lesson to draw from *Wilhelm*, and the many cases distinguishing it, is that exclusion is an effective deterrent. Once this Court and other circuits suppressed the fruits of such "bare bones"

affidavits, and investigators now know to give objective indica to enable magistrates to make meaningful evaluations.

This case presents another recurring problem that sister circuits have flagged in *Griffith* and *Mora*: sophisticated investigators using mobile phones and "knowledge, training, and experience" boilerplate to justify residential searches. Without saying anything untrue that would implicate *Franks v. Delaware*,  438 U.S. 154 (1978), a skillful affiant can convey an illusion of probable cause.

On its face, Agt. Gorman's affidavit was sophisticated and careful, and at the same time was utterly lacking in probable cause to search the Target Residence. It recited facts that cut against probable cause—such as the inability to surveil the Target Residence—and made them sound suspicious, even though at the Fourth Amendment's "'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Jardines*, 569 U.S. at 6.

A second elephant in the room is that Mr. Dales stands convicted of very serious crimes that resulted in a 316-month sentence. But courts have made the conscious decision that persons found with contraband must be the ones to deter illegal searches and seizures. Qualified

immunity bars nearly all suits when an illegal search turns up nothing.[2] The undeterred conduct metastasizes over time and becomes routine. We then face the greater challenge of deterring conduct that has become ingrained.

The only effective deterrent is suppression of the sort that worked in *Wilhelm*. If the Court will forgive some dramatic flourish, the works of Shakespeare help illuminate what endures in the public consciousness. Tragedies that remained seared into the public consciousness include *Hamlet, Macbeth, King Lear, Othello, Julius Caesar*, and even *Romeo and Juliet*, despite the low marks that most Shakespeare scholars give it. They embodied tragedies' defining characteristic: that the protagonists' flaws led to their downfall. By contrast, Shakespeare's tragicomedies are among his least-remembered. Plays like *Cymbeline* and *All's Well That Ends Well* followed tragedy's beats, until the protagonists escaped the consequences of their actions, sometimes by divine intervention. Without consequences, there was no enduring message.

---

[2] Qualified immunity is a court-made doctrine. *Rogers v. Jarrett*, 63 F.4th 971, 980 (5th Cir. 2023) (Willett, J., concurring). Courts need not even address whether a state violated someone's constitutional rights if the plaintiff cannot meet the rarely satisfied "clearly established" prong. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

When appellate decisions apply the good-faith exception, the message on the ground is that all's well that ends well. Law enforcement proceeds with little change, knowing that every case has unique facts to craft an argument for good faith, and confident that the courts will rescue them from consequences like a *deus ex machina.*

There is no reliable way to know how many residential warrants, similarly lacking a minimal nexus, turn up empty. Innocent people's lives are upended, but qualified immunity deters potential counsel. Nor do we know how many defendants plead guilty, despite grave Fourth Amendment violations, to avoid the risk of a far-greater post-trial sentence.

As a third elephant in the room, Magistrate Judge Colson enjoys an excellent reputation. But that reputation makes this case particularly well-suited to draw a line. When a state magistrate signs a warrant that cannot survive *Leon*, the natural inclination among the federal bar and federal investigators is to congratulate themselves for knowing better. Federal-state snobbery is real. But when an esteemed federal magistrate judge is involved, everyone stops and pays attention. The message is not to diminish the magistrate judge's reputation but to remind everyone

that we are all fallible. Even the best investigators, attorneys, magistrate judges, and Article III judges make grave errors.

The greater social cost would be to give up this prime opportunity to deter Fourth Amendment violations. Supreme Court case law forces unsympathetic criminal defendants to become the standard-bearers for protecting everyone else's Fourth Amendment rights. Criminal defendants are entitled to counsel to press those claims. Law-abiding citizens, when subjected to unlawful searches, seldom have recourse. Qualified immunity deters attorneys from representing them, and the quantifiable monetary damages from an unlawful residential search are rarely large enough even to justify tilting at windmills. The Court must resist any temptation to say the social costs are too great, when suppression is necessary to protect all of us from unlawful searches.

This case falls squarely within the *Leon* exception for so affidavits lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, *supra* §§ II.B-C, and it is vital that the Court suppress the evidence here.

## Conclusion

The Court should reverse and remand with directions to grant the motion to suppress.

Respectfully submitted:

/s/ *Steven M. Klepper*
Steven M. Klepper
KRAMON & GRAHAM, P.A.
750 East Pratt Street, Suite 1100
Baltimore, Maryland 21202-3201
(410) 752-6030
sklepper@kg-law.com

*Appointed Counsel for Appellant*

## Statement Respecting Oral Argument

Even in denying suppression, the district court found "a little bit closer call than what would normally be the case." JA378. As set forth in this brief, the lack of probable cause was manifest.

Further, it would be of great assistance to the bench, bar, law enforcement, and ordinary citizens for this Court to issue a precedential decision addressing the important recurring issues that this brief highlights: residential warrants to search for electronic devices outside the child-pornography context; reliance on mobile phones to justify sweeping residential searches; and sophisticated affidavits that create an illusion of probable cause.

/s/ *Steven M. Klepper*
Steven M. Klepper

## Certificate of Compliance

I hereby certify that this brief complies with: (1) the 13,000 word type-volume limitation of Fed. R. App. P. 32(a)(7)(B), in that it contains 12,339 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and (2) the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportional typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ *Steven M. Klepper*
Steven M. Klepper

## Certificate of Service

I hereby certify that, on September 3, 2025, I filed this brief with the Court's CM/ECF system, which will cause copies to be served on all counsel of record.

/s/ *Steven M. Klepper*
Steven M. Klepper