No. 25-4202

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

## UNITED STATES OF AMERICA,

Plaintiff – Appellee,

**v.**

## RYAN E. DALES,

Defendant – Appellant.

---

On Appeal from the United States District Court
for the District of Maryland, Northern Division,
The Honorable George L. Russell, III, Chief District Judge.

---

## APPELLEE'S CORRECTED RESPONSE BRIEF

---

Kelly O. Hayes
United States Attorney

David C. Bornstein
Assistant United States Attorney
Chief, Appellate Division
United States Attorney's Office
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 290-4800

TABLE OF CONTENTS

Table of Authorities .......................................................................................... iii

Jurisdictional Statement ......................................................................................1

Statement of the Issues on Appeal ......................................................................2

Statement of the Case...........................................................................................3

    A.    Dales's Underlying Criminal Conduct....................................................3

    B.    Relevant Procedural History ...................................................................7

        I.    The 26-page affidavit for the challenged search warrant, as well as the magistrate judge's issuance of the warrant……….....…....8

        II.    Dales's motion to suppress the fruits of the first search warrant, as well as the parties' later briefing………………………..17

        III.    The district court's oral ruling denying Dales's suppression motion……………………………………………………...18

        IV.    Dales moves for reconsideration of the oral suppression ruling…………………………………………………………20

        V.    Dales is convicted of five counts and receives a guidelines sentence………………………………………………………21

Summary of the Argument...................................................................................22

Argument..............................................................................................................23

    I.    The magistrate judge had a substantial basis to find that the warrant affidavit established probable cause.

    A.    Issue.......................................................................................................23

    B.    Standard of Review ...............................................................................23

C.   Analysis ...................................................................................23

   1.   The affidavit established probable cause to search Dales's residence for financial records, IRS documents, and other pertinent documents……………………………………..……26

   2.   The affidavit established probable cause to search Dales's residence for electronic devices and the electronic records contained therein………………………………………...…34

   3.   Dales's arguments against probable cause are meritless……..40

II.   If the magistrate judge did not have a substantial basis for his probable-cause determination, the district court properly found that suppression is still not warranted because of the good-faith doctrine.

A.   Issue...................................................................................53

B.   Standard of Review ...........................................................53

C.   Analysis .............................................................................53

Conclusion ...........................................................................................56

Certificates of Compliance and Service...............................................57

# TABLE OF AUTHORITIES

## **CASES**

*Davis v. United States*, 564 U.S. 229 (2011) ...................................................... 53-54

*Florida v. Harris,* 568 U.S. 237 (2013) ............................................................ 24-25

*Frey v. Johnson*, 54 F.3d 773 (4th Cir. 1995).......................................................33

*Illinois v. Gates*, 462 U.S. 213 (1983) ........................................... 23-25, 29, 45, 48

*Massachusetts v. Upton*, 466 U.S. 727 (1984) .....................................................25

*Messerschmidt v. Millender*, 565 U.S. 535 (2012) ...............................................54

*Moretti v. Thorsdottir,* 157 F.4th 352 (4th Cir. 2025) ...........................................24

*Payne v. Taslimi*, 998 F.3d 648 (4th Cir. 2021)............................................... 41-42

*Smith v. Munday*, 848 F.3d 248 (4th Cir. 2017) ..................................................54

*United States v. Aljabari*, 626 F.3d 940 (7th Cir. 2010).............................32, 40, 49

*United States v. Anderson*, 851 F.2d 727 (4th Cir. 1988)........................... 29, 40-43

*United States v. Bosyk*, 933 F.3d 319 (4th Cir. 2019) ...............................23, 45, 55

*United States v. Comstock*, 412 F. App'x 619 (4th Cir. 2011) ...............................30

*United States v. Epps*, 570 F. App'x 197 (3d Cir. 2014)...................................37, 45

*United States v. Freeman*, 685 F.2d 942 (5th Cir. 1982)................................... 30-31

*United States v. Glass*, 160 F.4th 563 (4th Cir. 2025)...........................................52

*United States v. Gondres-Medrano*, 3 F.4th 708 (4th Cir. 2021) ...........................24

*United States v. Grossman*, 400 F.3d 212 (4th Cir. 2005).....................................41

*United States v. Harris*, 369 F.3d 1157 (10th Cir. 2004) ...................................30, 33

*United States v. Hicks*, 64 F.4th 546 (4th Cir. 2023).................................................32

*United States v. Jones*, 942 F.3d 634 (4th Cir. 2019)..................................29, 35, 44

*United States v. Krueger*, 145 F.4th 460 (4th Cir. 2025)..........................................44

*United States v. Lalor*, 996 F.2d 1578 (4th Cir. 1993) ..................................... 41-42

*United States v. Leon*, 468 U.S. 897 (1984) ..............................................................54

*United States v. Martinez*, 106 F.3d 402 (6th Cir. 1997)...........................................31

*United States v. McNeal*, 818 F.3d 141 (4th Cir. 2016) ............................................51

*United States v. Mitchell*, 120 F.4th 1233 (4th Cir. 2024)........................................42

*United States v. Mora*, 989 F.3d 794 (10th Cir. 2021) ............................... 49-52, 55

*United States v. Ordonez-Zometa*, 141 F.4th 531 (4th Cir. 2025)...............23, 52, 55

*United States v. Orozco*, 41 F.4th 403 (4th Cir. 2022) ......................................42, 49

*United States v. Ramos-Cruz*, 667 F.3d 487 (4th Cir. 2012).....................................43

*United States v. Reyes*, 798 F.2d 380 (10th Cir. 1986)..............................................30

*United States v. Rhynes*, 206 F.3d 349 (4th Cir. 1999) ..................................... 29-31

*United States v. Richardson*, 607 F.3d 357 (4th Cir. 2010) ................................37, 45

*United States v. Robinson*, 275 F.3d 371 (4th Cir. 2001)..........................................29

*United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012)...............................................45

*United States v. Tucker*, 473 F.3d 556 (4th Cir. 2007)................................................3

*United States v. Turner*, 2023 WL 5696053, (9th Cir. Sept. 5, 2023)............... 35-36

*United States v. Wellman*, 663 F.3d 224 (4th Cir. 2011)....................................53-54

*United States v. Williams*, 974 F.2d 480 (4th Cir. 1992)...................................42, 48

*United States v. Young*, 847 F.3d 328 (6th Cir. 2017)...........................................49

*Wadkins v. Arnold*, 214 F.3d 535 (4th Cir. 2000)..................................................52

## STATUTES

18 U.S.C. § 922(g)(1)................................................................................7

18 U.S.C. § 924(c)(1)(A)(i) .......................................................................7

18 U.S.C. § 1028A(a)(1)............................................................................7

18 U.S.C. § 1343 ......................................................................................7

18 U.S.C. § 3231 ......................................................................................1

21 U.S.C. § 841(a)(1) and (b)(1)(B)(vi) ....................................................7

28 U.S.C. § 1291 ......................................................................................1

## OTHER AUTHORITIES

Fed. R. App. P. 4(b)(2)..............................................................................1

Fed. R. Crim. P. 11(a)(2) ..........................................................................21

The district court had jurisdiction of defendant-appellant Ryan Dales's federal offenses. 18 U.S.C. § 3231. The court entered a judgment of conviction against him on April 11, 2025. JA316-321.[1] Dales timely filed a notice of appeal from that final judgment on April 9, 2025, JA315, after he was sentenced, *see* JA12; Fed. R. App. P. 4(b)(2). This Court has jurisdiction to hear his appeal. 28 U.S.C. § 1291.

---

[1] Citations of "JA" refer to the Joint Appendix; "SA," Sealed Supplemental Appendix; and "AB," Appellant's Opening Brief.

**STATEMENT OF THE ISSUES ON APPEAL**

I.      **Whether the magistrate judge had a substantial basis to find that the warrant affidavit established probable cause to search Dales's apartment for evidence, fruits, and instrumentalities of the wire-fraud offenses.**

II.    **In the event the magistrate judge lacked a substantial basis, whether the officers executing the warrant relied on it in good faith, making suppression unnecessary.**

## A. Dales's Underlying Criminal Conduct[2]

In December 2020, Dales was spending the final months of his federal prison sentence for bank-fraud conspiracy and aggravated identity theft in a Volunteers of America halfway house in Baltimore, Maryland.[3] SA9, ¶ 31 (Dales's presentence report or PSR). Shortly after he got there, Dales filed a fraudulent unemployment-insurance claim with the State of Maryland, claiming he was an out-of-work barber.[4] Maryland denied the claim on the same day he filed it, explaining he was "ineligible for benefits." SA9, ¶ 31.

A couple weeks later, Dales applied to the Small Business Administration for a COVID-19 Economic Injury Disaster Loan, claiming that he owned an agricultural business that had three employees and a $10,000 revenue stream but that now needed $8,000 to tide itself over. But that was false: Dales was incarcerated throughout the

---

[2] These facts are gleaned from undisputed parts of Dales's presentence report. *See United States v. Tucker*, 473 F.3d 556, 558 (4th Cir. 2007).

[3] In 2019, Dales was sentenced to 62 months in prison, to be followed by 60 months of supervised release, for those offenses. He and his co-conspirators had used the personal identities of at least 39 individual victims to defraud multiple banks of $241,852.78 lent on the victims' credit. SA21-22, ¶ 95.

[4] Despite being 32 years old at the time, *see* SA3, Dales had an almost non-existent employment history: four months as a delivery person in his late 20s and, before that, a few short-term jobs as a teenager, SA32, ¶¶ 150-151.

entire time he claimed to be running the business. Indeed, no such business existed. The SBA declined to grant him the loan. SA9-10, ¶ 35.

In July 2021, Dales reopened his unemployment-insurance claim to request Pandemic Unemployment Assistance, a benefits program that Congress established in the Coronavirus Aid, Relief, and Economic Security Act. In support of that new request, Dales submitted a fraudulent IRS Form 1040, Schedule C, for 2019. The fake form said that he owned a "sole proprietorship" that made $99,081.35 in profit in 2019. That was a lie: He did not file a Schedule C Form for the 2019 tax year (or the 2020 tax year, for that matter) and in fact was incarcerated that entire year. This time, however, Dales's fraud worked. Maryland's Department of Labor granted him $25,570 in PUA benefits. SA9, ¶¶ 32-34.

From June to September 2022, Dales used the personal identities of several individual victims to purchase at least seven high-end lawnmowers, worth between $9,500 and $19,500 each, on credit taken out in the victims' names. He had obtained these stolen identities on the dark web. To assume each victim's identity, he created fake out-of-state driver's licenses bearing the victims' personal information but *his* photograph. He bought the lawnmowers from retailers entirely on credit, converted the lawnmowers into cash by selling them, and never paid off the retailers, pocketing all the proceeds from his sales. SA10-12, ¶¶ 36-42, 44.

By means of these fraudulent schemes, Dales was able to move into and then furnish a luxury apartment in Baltimore—located in Anthem House at 900 East Fort Avenue—that had a monthly rent of $3,064. SA11, ¶ 42.

From that luxury apartment (an astonishing step-up from the halfway house he lived in only months earlier), Dales appears to have operated a drug-distribution and identity-theft operation, and he had the gun-power to protect it. When federal agents searched Dales's apartment pursuant to two warrants on January 20, 2023,[5] they found a loaded Smith & Wesson M&P 9c 9mm handgun, a loaded Polymer 80 9mm handgun with no serial number, an extra handgun magazine loaded with 12 rounds of 9mm ammunition, a box of 9mm ammunition, a large plastic bag holding 716 gelcaps filled with a white-and-brown powder, two bags of brown powder, a bag of white powder, a blender and digital scales covered in a white-powder residue, hundreds of empty gelcaps (in a bag that once held 10,000 of them), and multiple sifters, baggies, and other packaging material. SA5-6, ¶ 12. The powder in the gelcaps was a mixture of fentanyl and 4-Anilino-N-Phenethylpiperidine (4-ANPP),

---

[5] The agents entered the apartment under a warrant to search for any evidence, fruits, and instrumentalities of Dales's wire fraud offenses, but then they got a second warrant to search for evidence of gun and drug crimes after seeing guns and drugs in plain view in the apartment. SA5, ¶ 11; *see also* JA133, JA220.

and the agents seized over 339 grams of that fentanyl-containing substance. Each gelcap of the fentanyl mixture had a street value of $10. SA7, ¶¶ 18-19.

The agents also found multiple computers, six cellphones (with nine SIM card kits), bulk packages of shrink-wrapped white PVC cards, an embosser and ID card printer, laminate sheets with security holograms, a card reader, and several fake out-of-state driver's licenses showing the personally identifiable information of different identity-theft victims but Dales's photograph. SA5, ¶¶ 9, 12; SA11-12, ¶ 43. Dales, too, was in the apartment (it was 6:00 a.m. when the agents entered), and he was arrested. SA6, ¶ 16.

After waiving his *Miranda* rights, Dales told the agents that he had been living in the apartment for about one year, owned the handguns in the apartment, and used various phones and email addresses, including theycallmedales@gmail.com. SA8, ¶ 23. He admitted to obtaining unemployment benefits fraudulently and possessing the fake out-of-state driver's licenses. SA12, ¶ 45. All told, his fraudulent schemes since returning to Baltimore in December 2020 netted him $121,242.51 in ill-gotten gains. SA12, ¶ 47. According to his probation officer, Dales did not "maintain employment" after he entered supervised release in June 2021. SA21-22, ¶ 95.

When the agents arrested Dales in his apartment in January 2023, he could not lawfully possess any gun or ammunition because he "had previously been convicted

of a crime punishable by imprisonment for a term exceeding one year and his civil

rights had not been restored." SA7, ¶ 20. Indeed, he had accumulated eight criminal

convictions in the past fifteen years, more than half of which actually resulted in a

sentence of more than one year in prison. SA16-21, ¶¶ 85-95.

## B.     Relevant Procedural History

A grand jury issued an indictment charging Dales in eight counts: (1) wire

fraud, in violation of 18 U.S.C. § 1343, stemming from the $25,570 in Pandemic

Unemployment Assistance benefits he had obtained; (2) being a convicted felon

possessing a firearm, in violation of 18 U.S.C. § 922(g)(1); (3) possessing with intent

to distribute 40 grams or more of a fentanyl mixture, in violation of 21 U.S.C.

§ 841(a)(1) and (b)(1)(B)(vi); (4) possessing a firearm in furtherance of the drug-

trafficking crime in Count Three, in violation of 18 U.S.C. § 924(c)(1)(A)(i); (5-7)

three counts of wire fraud, in violation of 18 U.S.C. § 1343, stemming from the

lawnmowers he had purchased using the credit of his identity-theft victims; and (8)

aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). JA37-49.[6]

Because Dales's appeal challenges the district court's decision that there was

probable cause to search his residence for evidence, fruits, and instrumentalities of

---

[6] The government later explained that "venue" did not exist in the District of Maryland for the other instances of wire fraud and identity theft. *See* JA365.

the wire-fraud offenses, AB19-63, the next section summarizes the probable-cause affidavit underling that search warrant.

     *I.*     *The 26-page affidavit for the challenged search warrant, as well as the magistrate judge's issuance of the warrant.*

On January 18, 2023, Special Agent Brian Gorman of the U.S. Department of Labor submitted to Magistrate Judge J. Mark Coulson an application for a warrant to search Dales's residence, together with a typed 26-page affidavit setting forth the probable cause to do so.[7] JA95, JA101-126. Agent Gorman explained that he was assigned to a task force "investigating pandemic-related fraud" and that he had been investigating Dales with respect to "fraudulent benefits involving Unemployment Insurance ('UI'), the Paycheck Protection Program ('PPP'), and Economic Injury Disaster Loan ('EIDL') program." JA101-102. Agent Gorman had discovered that "beginning in or about December 2020—when [Dales] began residing at the [VOA] halfway house," "UI, EIDL, and PPP applications contain[ing] false statements and misrepresentations" started to be "submitted in the name of Dales and purported businesses that he allegedly operated." JA109. "At times, the applications included

---

     [7] Agent Gorman also applied for warrants to search T-Mobile's records for information about the cellphone assigned phone number 443-652-7684 and to search Dales's person. *See* JA92, JA98. His affidavit set forth the probable cause for those warrants as well. *See* JA101. The magistrate judge issued both warrants, *see* JA93, JA99, and Dales does not challenge them on appeal.

fabricated documents, including fake and fraudulent Internal Revenue Service (IRS) tax records." JA109. All of these "applications and loan documents were submitted by Dales . . . electronically via the internet." JA109. The agent stated further:

In December 2020, "an unemployment claim in Dales's name was submitted under [Maryland's] regular UI program." JA109. The application claimed that Dales was a self-employed barber who had stopped providing services in April 2020. The application listed the VOA halfway house as Dales's address, and it was sent from an IP address associated with the halfway house. JA109. The application provided an email address for Dales: theycallmedales@gmail.com. JA109-110. That email address is registered to "Ryan Dales," lists his "true date and month of birth in 1988," and has a recovery phone number, 443-652-7684, that is also the number that Dales used to "communicate with his probation officer." JA112-113, JA115. Maryland promptly denied the application on the ground that Dales had "not earned sufficient wages in the prior year . . . to be eligible for [unemployment] benefits." JA110.

A couple weeks later, an alleged "agriculture" business called "Ryan Dales" submitted an EIDL application to the Small Business Administration, claiming that it began operating in March 2018, employed three people, and had a gross revenue of $10,000 in 2019. JA112-113. It claimed that its primary business address was the same address—3231 Southgreen Road in Windsor Mill, Maryland—that appeared

as Dales's home address on his Maryland State ID card, even though an "Evelyn J. Dales" had sold off the property (perhaps unbeknownst to Dales) three weeks before the EIDL application was filed. JA113-115. This business said it had an employer identification number that was "identical" to Dales's social security number. JA112. Its phone number, 443-652-7684, was the same one that Dales used to "communicate with his probation officer." JA112-113. And its email address was once again theycallmedales@gmail.com. JA112-113. The alleged business's EIDL application was rejected because of its "unsatisfactory credit history." JA114.

In March 2021, a sole proprietorship, acting through its owner "Ryan Dales," submitted a PPP loan application to an SBA-approved lender. Dales claimed that his business opened its doors in August 2018, had an "average monthly payroll" of "over $8,000," and now needed "more than $20,000 in funds" to cover its total expenses. JA114. For Dales's contact information, the application provided the address of a house that appeared to belong to his parents, his accurate date of birth, and the by-now-familiar 443-652-7684 phone number and "theycallmedales" Gmail address.[8]

---

[8] Agent Gorman concluded that the house's owners, Kenneth and Annette Dales, were Dales's parents "based on database searches." JA111. But Gorman was mistaken. Dales's mother was Gwendolyn Brody, and he had never met his father and did not know his name. SA27, ¶ 114. Dales did not mention any Kenneth or Annette when discussing his family relationships in the PSR. *See* SA27-29, ¶¶ 113-126. His grandmother, Evelyn Dales, died in 2018. SA28, ¶ 123.

10

JA114. The application included a fraudulent IRS Form 1040, Schedule C, for 2019 that displayed Dales's name, his actual social security number, and the same address he had provided on the PPP application. The Schedule C Form claimed that the sole proprietorship had a gross profit of $113,219 in 2019, that it was in the business of "home improvement," and that Dales "materially participated" in its operations that year (even though, in reality, he had been incarcerated the entire time). JA114. The application also included a color copy of Dales's Maryland State ID Card, as well as a bank statement for a Wells Fargo account and a voided check for a Navy Federal Credit Union account, both of which were in Dales's name. JA114-115. The PPP loan "ultimately did not close." JA115.

In July 2021 (eight weeks *after* Dales moved out of the VOA halfway house), Dales reopened his unemployment-insurance claim with Maryland. JA110; *see also* JA108 (noting that Dales lived in the halfway house from December 9, 2020, to June 4, 2021). He requested Pandemic Unemployment Assistance (PUA), which granted unemployment benefits to self-employed individuals who "otherwise would not qualify for regular UI compensation." JA110 & n.2. To show that he was eligible for PUA, Dales "upload[ed] two apparent IRS documents"—an SS-4 EIN Assignment Form and another Form 1040, Schedule C, for 2019. JA110. The SS-4 Form asserted that Dales was "the sole member of a purported business known as 'KNW Group,'"

11

which "allegedly provided beautician services." JA110-111. This business had the same address as the purported home-improvement business underlying Dales's PPP loan application. JA110, JA114. But unlike Dales's purported agricultural business, *see* JA112, this business appeared to have an employer identification number that was issued in April 2018. JA110. Meanwhile, the Schedule C Form claimed that a business called "Knw Gr86oup" (as opposed to "KNW Group," the business Dales claimed to own) had a gross profit of $144,112.35 in 2019.

Dales's PUA benefits application was filled with false representations. For example, he did not file a Form 1040, Schedule C, or report any business income in his 2019 and 2020 federal tax returns. JA111-112. He also was incarcerated for all of 2019, hampering his ability to operate a sole proprietorship. JA112. Maryland nonetheless awarded Dales $25,570 in PUA benefits in August and September 2021, backdating the benefits to December 2020. JA112. Based on the financial numbers in the Schedule C Form that he had uploaded to the application, Maryland awarded him more unemployment benefits than he otherwise would have received. JA112.

In June 2022, Agent Gorman received from Google its records for the Gmail account (theycallmedales@gmail.com) listed on the UI, PPP, and EIDL applications described above. JA115. Google turned over the records pursuant to a federal search warrant. JA115. The records contained emails from the Maryland Department of

Labor to Dales about unemployment insurance, as well as emails from Wells Fargo and Navy Federal Credit Union warning Dales that he either had insufficient funds in his account or was being declined a line of credit. JA115. The records also showed that starting in January 2022 Dales began to reside in Anthem House, "a luxury rental apartment building in the Locust Point area of Baltimore." JA116.

In November 2022, federal agents obtained a search warrant for three other Gmail accounts linked to Dales, including ryane.dales@gmail.com, and they found in those accounts (which all appeared to be opened by Dales) additional emails from banking institutions, as well as money-transfer institutions. JA116. The agents also got a search warrant for the Apple ID accounts connected to those Gmail accounts. JA117. The Apple ID accounts were all registered to "Ryan Dales," and they all provided the same address for him that he had listed on his EIDL application for the purported business called "Ryan Dales." JA117.

In the Apple ID account for ryane.dales@gmail.com (specifically, its iCloud account), the agents found dozens of driver's-license-style photos of other people, several of which also appeared on "separate images of Driver's Licenses or State Identification (ID) Cards." JA117. Some of the IDs "contained the same photo, but different Personally Identifiable Information (PII)." JA117. When the agents looked up the PII listed on a Maryland Driver's License bearing the photo of a Black man,

13

the PII turned out to belong to a white man. JA117. The agents also found in that account "pay stubs or earnings statements" for several people, including one, dated September 2020, that claimed to be for Dales, stating that he had earned $61,982.28 so far that year from a purported production company. JA118. Agent Gorman could not find "any record" that the company existed in Maryland, and in any event Dales was released from the Bureau of Prisons only in December 2020. JA118 & n.7. Like the EIDL and PPP applications filed under Dales's name, this Apple ID and iCloud account was also "associated with phone number 443-652-7684." JA117.

In December 2022, agents learned from T-Mobile that the cellphone assigned phone number 443-652-7684 was activated on December 10, 2020 (*i.e.*, the day after Dales moved into the VOA halfway house from federal prison) and was still active. JA118. They further learned that the cellphone had been used to call Anthem House. JA118. The phone was also used, as noted, as Dales's "contact number" on the EIDL and PPP applications, as well as the number at which his federal probation officer contacted him. JA118-119. It was also the phone number listed on Dales's Gmail and Apple accounts. JA118-119.

As for Dales's apartment in Anthem House, Agent Gorman noted that Dales had been living there for a year—renting a two-bedroom, two-bathroom apartment at $3,064 per month—but did not always pay his rent. JA119-120 (Anthem House's

management reported that Dales had paid rent the prior month but still owed rent for four other months). Dales had listed that apartment as his residence with Maryland's Department of Labor and its Motor Vehicle Administration. He also provided the apartment as his address on both his Amazon and PayPal accounts. JA120-121. And he used it as the address where he received personal deliveries. JA120.

Agent Gorman said that he knew based on his training and experience that it is "common" for people who commit fraud to keep "records of [the] fraud, amounts of currency, and financial instruments in secure locations within [their] residences" so that they have "ready access" to them. JA104. Agent Gorman further knew that offenders "may maintain books, records, receipts, notes, . . . and other papers relating to the[ir] commission of fraudulent applications or transactions, [and] the proceeds derived from those transactions, . . . in secure locations where they are [nonetheless] readily accessible, including within their residence(s)." JA104. Agent Gorman knew as well that offenders "who commit fraud amass proceeds from their crimes," that they "utilize domestic banks and their attendant services" to handle those proceeds, and that they "commonly keep records of these transactions in secure locations like residences." JA105. And Agent Gorman knew, among other things, that people who commit wire fraud "frequently utilize computers and cellular telephones to commit

15

their crimes" and that relevant "instant messages, emails, voicemails, photos, and videos . . . may be saved on [the] physical device." JA102-103.

Based on these statements and others in his 26-page affidavit, Agent Gorman applied for a warrant to search Dales's residence, *see* JA128, and seize, among other things, "any and all information and records that constitute fruits, evidence, . . . and instrumentalities of violations of Wire Fraud," including "[a]ny and all records from the period January 1, 2019 to present concerning unemployment insurance (UI) benefits," the "Paycheck Protection Program," the "Economic Injury Disaster Loan ('EIDL') program," and "any business entities (or purported business entities) for which Dales . . . obtained, attempted to obtain, or assisted with obtaining . . . PPP, EIDL, or other loans." JA133. The warrant application also sought authorization to search for and seize Dales's "financial records" and "tax documents from the period January 1, 2019 to present," including any IRS Form 1040, Schedule C. JA133. And it sought authorization to search for and seize "[a]ll computers, cell phones, tablets, and other computer hardware . . . and data that may constitute instrumentalities of, or contain evidence related to the specified criminal offenses." JA134.

On January 18, 2023, Magistrate Judge Coulson signed off on the warrant application, finding that the affidavit established probable cause to search Dales's apartment for all the items listed in "attachment B-2." JA96.

## II. Dales's motion to suppress the fruits of the first search warrant, as well as the parties' later briefing.[9]

Dales moved the district court to suppress the evidence that the agents seized from his apartment on the ground that the showing of probable cause in the affidavit for the first search warrant was stale. JA63-66. He argued that the warrant was issued in January 2023 but that the affidavit contained "no information related to any crime after September 2021." JA63. He said that "[n]early all of the activity addressed in the affidavit is claimed to have occurred not when [he] lived [in the apartment that was searched] but when he lived at the [VOA halfway house]." JA65.

The government opposed Dales's suppression motion. JA67-83. Among other things, it argued that "law enforcement had probable cause to believe that [Dales] used electronic devices in connection with his alleged criminal activity and that those devices—among other evidence including financial records—would be found in [his current] residence." JA73. Noting that "the warrant authorized seizure of records . . . relating to, among other things, UI, PPP, and EIDL applications, IRS records, [and] financial records," the government argued that there was "probable cause to believe that this evidence (even if in hard copy) would be found in [the] residence." JA78.

---

[9] When executing the first warrant, agents saw guns and drugs in plain view in Dales's apartment, so they obtained a second warrant to search the apartment for any evidence of gun and drug offenses. *See* JA211-220. Dales does not separately challenge the second search warrant.

In reply, Dales asserted that the "entire point" of his suppression motion was "that the affidavit lacked probable cause to believe any evidence of a crime would be in [his] apartment sixteen months after the last alleged criminal activity." JA223 n.1. Observing that he moved into the apartment in January 2022, he asserted that the most recent "activities" mentioned in the affidavit were his "alleged uploading of two documents [to support his UI application] in July, 2021," and then his receipt of "payments made as a result of the [UI] application in August to September, 2021." JA223. Dales acknowledged that the warrant authorized a "records search" of his apartment, JA225, but he argued that the "length of time these records are kept . . . in a fraud case" did not justify the search, JA227. Finally, he said that the fraudulent applications underlying the wire-fraud charges must have been filed "electronically by computer" because "documents were uploaded with [them]." JA231. He argued that the agents should have assumed that that computer had been left "at the VOA [halfway house]" and not taken with him to any new residence. JA231.

III.    *The district court's oral ruling denying Dales's suppression motion.*

After the parties finished briefing the suppression motion, the district court held a non-evidentiary hearing, JA322-380, where it orally denied the motion from the bench. The court noted that Dales had "used electronic device[s] to commit and in connection with [the] criminal activity," that he provided his "cell phone number"

on the fraudulent applications he allegedly submitted, and that the iCloud account associated with that cellphone number contained "purported fraudulent documents." JA375-377. The court found that the "nature of the electronic storage" of data meant that any "evidence" on Dales's "electronic devices" would "not likely . . . be stale." JA377. And it observed that the warrant affidavit said that there was probable cause that Dales's cellphone contained "information . . . manifesting criminal activity" and "would be found at the residence." JA376; *see also* JA369 (Dales conceding that there was "likely probable cause that he had his cell phone" "in his apartment").

Next, the court noted that the search warrant "also sought records and other data on [the] applications," including "IRS records" and "hard" copies of the records. JA336, JA378. The court agreed with Agent Gorman's assessment that "financial records are typically kept in residences," JA376-377, and it disagreed with Dales's argument that there was "nothing to suggest that the records would be at [Anthem House]," JA338. To the contrary, the court found that it was "more reasonable to assume that he took the financial records with him [to his new apartment] than [that] he would have left them at the VOA [halfway house]." JA354.

Finally, the court stated that Dales had been engaged in "multiple periods of fraudulent activity that [were] ongoing." JA378.

Based on the "totality of the circumstance[s]," including paying "deference" to the magistrate judge's "probable cause determination" and the "inferences" that law enforcement may draw "based upon their experiences," the court concluded that the warrant affidavit had established probable cause. JA376, JA378. And even if the affidavit hadn't done so, the court held that "the good faith exception would end up being applicable here." JA378. The court also said,

IV.    *Dales moves for reconsideration of the oral suppression ruling.*

More than five months later, Dales moved the district court to reconsider its suppression ruling. *See* JA241-251. He argued, as relevant, that the warrant affidavit provided no basis for its statement that the December 2020 unemployment-insurance claim filed in his name was submitted from a device connected to the IP address for the VOA halfway house—where he was living at the time. JA246-247. Dales argued that it was "patent that someone other than Dales could have used his information" to file the fraudulent applications, thereby flagging the potential defense that he had been a victim of "identity theft." JA246.

The government responded by pointing out that "the discovery . . . contain[ed] a document from Verizon showing that the IP address used was associated with the VOA." JA255. Dales's lawyer then withdrew that basis for reconsideration. JA256. The court denied reconsideration in a one-page order. JA285.

*V.*      *Dales is convicted of five counts and receives a guidelines sentence.*

The district court severed the superseding indictment's gun and drug counts (Counts 2 to 4) from its fraud and identify-theft counts (Counts 1, 5 to 8). JA240.

Dales proceeded to trial first on the gun and drug counts before the Honorable George L. Russell, III, and a jury. *See* JA9. The jury convicted Dales of all counts. JA298-299. He later pleaded guilty to aggravated identity theft and one count of wire fraud pursuant to a written plea agreement under which he "reserve[d] the right to appeal the district court's oral ruling denying his Motion to Suppress Evidence and Statements (ECF No. 48)." JA300, ¶ 1; JA305, ¶ 10(a); *see also* Fed. R. Crim. P. 11(a)(2). The court sentenced him to a total of 316 months in prison, to be followed by 60 months of supervised release, JA317-318, which was the bottom of his undisputed guidelines range.

This timely appeal follows.

## SUMMARY OF THE ARGUMENT

The Court should affirm the district court's order denying Dales's suppression motion because the magistrate judge had a substantial basis to find that the agent's 26-page warrant affidavit provided probable cause to search Dales's apartment for evidence, fruits, and instrumentalities of the wire-fraud offenses. The affidavit was based on a months-long investigation. It explained how Dales had undertaken at least three schemes to defraud government programs during the pandemic by submitting fraudulent online applications for funds and benefits. It identified specific fraudulent tax documents that Dales uploaded to the applications in furtherance of the schemes, as well as the cellphone number and Gmail address he provided on the applications as his contact information. And it noted that about four months before he moved into his luxury apartment, which was an astonishing step-up from the halfway house he had lived in only months earlier, one of the schemes paid off—netting him $25,570. In the circumstances, the magistrate judge properly found probable cause to search Dales's apartment for a whole list of items. In any event, the officers executing the warrant relied on it in good faith, making suppression unnecessary.

Dales largely insists that there was probable cause to search his apartment for only his cellphone. That premise is mistaken, as are the arguments based on it. His entire challenge is built on feet of clay, and it should be rejected.

**I.    The magistrate judge had a substantial basis to find that the warrant affidavit established probable cause.**

**Issue:**

Dales argues that the district court erred in holding that the warrant affidavit established probable cause to search his residence. AB19-49.

**Standard of Review:**

"Since a magistrate judge issued the challenged warrant, [this Court's] task isn't to assess probable cause de novo." *United States v. Bosyk*, 933 F.3d 319, 325 (4th Cir. 2019); *accord Illinois v. Gates*, 462 U.S. 213, 236 (1983) ("[W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review" because doing so would be "inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant."). Instead, the Court "review[s] a magistrate judge's decision to issue a search warrant with 'great deference' and 'ask[s] only whether the judicial officer had a substantial basis for finding probable cause.'" *United States v. Ordonez-Zometa*, 141 F.4th 531, 555 (4th Cir. 2025).

**Analysis:**

This Court should affirm the district court's order denying suppression of the evidence found in Dales's residence because the magistrate judge had a substantial

basis to find (and, indeed, correctly found) that there was probable cause to search it for "information and records that constitute fruits, evidence, . . . and instrumentalities of violations of Wire Fraud." JA133. This is not a case where the magistrate judge's probable-cause determination was the "mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239. Far from being bare-bones, Agent Gorman's warrant affidavit spanned 26 typed pages and covered what he and other agents had learned over a months-long investigation, including from search warrants for Dales's online accounts issued at various times over the prior six months. *See* JA101-126.

"Probable cause has long been understood to encompass circumstances that, while less than a preponderance, 'warrant suspicion.'" *United States v. Gondres-Medrano*, 3 F.4th 708, 714 (4th Cir. 2021). "The probable cause bar is a low one," and an officer need not "exhaust every . . . lead or resolve every doubt . . . before [it] is established." *Moretti v. Thorsdottir*, 157 F.4th 352, 364 (4th Cir. 2025). An officer has "probable cause" to "search when 'the facts available to [him] would warrant a [person] of reasonable caution in the belief' that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013). Probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts," and there are no "inflexible, independent requirements applicable in every case." *Id.* at 244. All that is "required is the kind of 'fair probability' on which 'reasonable and

prudent [people,] not legal technicians, act.'" *Id.* at 244 (alteration in original) (quoting *Gates*, 462 U.S. at 231, 238). "[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Massachusetts v. Upton*, 466 U.S. 727, 734 (1984) (per curiam).

As an initial matter, Dales does not dispute that the affidavit showed probable cause that he committed wire-fraud offenses. That may be because it indisputably did. The affidavit established that since December 2020 "Ryan Dales" had submitted online applications for himself (for unemployment benefits, JA109), for an alleged business he said he owned (for PPP funds, JA114), and for another alleged business bearing his name and social security number as its corporate name and employer identification number (for EIDL funds, JA112). All three applications provided "theycallmedales@gmail.com" as the applicant's contact email address. JA109-110, JA113-114. That email address was registered to a "Ryan Dales" whose birth date was Dales's "true date and month of birth in 1988," and the account's "recovery phone number" was "443-652-7684," which was the number that Dales was using to "communicate with his probation officer." JA113, JA115. Both businesses that Dales allegedly operated provided that same number as the business's contact phone number. JA112, JA114. The home address on the unemployment-insurance claim for Dales was Dales's then-residence at the VOA halfway house. JA109. And the

25

business addresses on the PPP and EIDL applications for Dales's alleged businesses were addresses previously affiliated with Dales or, it appeared, his family. JA113-115. And it is undisputed that the applications each contained materially false and fraudulent statements by representing that Dales was a self-employed barber or the sole proprietor of businesses during the years that he (in actuality) was incarcerated. *See* JA109-114. So there was probable cause to believe that he had used the internet to commit three recent wire frauds.

As the government argued at the suppression hearing, the warrant affidavit went on to show probable cause to search Dales's residence for *at least* "two broad categories of items": (1) "electronic devices and [the] electronic records contained therein," and (2) "financial records, IRS documents, . . . bank account statements, bills, and [other] documents pertaining to [the programs he defrauded]." JA344.

**1.   The affidavit established probable cause to search Dales's residence for financial records, IRS documents, and other pertinent documents.**

The warrant application primarily requested authorization to search Dales's residence for financial records, tax documents, and records related to unemployment insurance benefits and PPP and EIDL funds, among other records. *See* JA133. The warrant affidavit amply demonstrated probable cause to believe that such evidence of Dales's wire frauds and their fruits would be found in his residence.

First, the warrant affidavit provided probable cause to believe that Dales had used federal tax forms in committing the wire frauds and that his tax documents and financial records would provide evidence of those offenses. The affidavit explained that in March 2021 Dales "submitted online" an application for PPP funds for a sole proprietorship he allegedly owned and that he attached an IRS Form 1040, Schedule C, in which he claimed that in 2019 he made "a net income of $103,102" from the alleged business. JA114. The affidavit also said that in July 2021 Dales "upload[ed]" to his application for unemployment benefits an IRS Form SS-4 that provided an employment identification number for a second sole proprietorship that he allegedly owned. JA110. Dales uploaded, too, another IRS Form 1040, Schedule C, in which he claimed that in 2019 he made "a net profit of $99,081.35" from this other alleged business. JA111. The following month, the State of Maryland began to award Dales unemployment benefits based on the IRS documents he had uploaded. JA112. But in his filed 2019 and 2020 federal tax returns, he did not report any business income or losses, nor did he submit a Schedule C Form. JA111-112. So regardless of whether Dales's personal copy of his tax records contained the IRS forms submitted with the fraudulent applications or the IRS forms he had filed with his actual tax returns *or both*, there was probable cause to believe that those records contained evidence of his wire frauds. If Dales's records contained the IRS forms filed with the fraudulent

applications, it would clearly prove that *he* had filed those applications and thereby disprove the defense, which he suggested at one point, that perhaps "someone other than [he had] used his information" to make it look like he had filed the applications. JA246. If the records contained instead the IRS forms filed with his tax returns, it would show that Dales knew or should have known that the different forms he filed with the applications were fraudulent. And if the records contained both sets of IRS forms, it would make his guilt almost indisputable. To take another example, Dales must have done *something* with the $25,570 in unemployment benefits that he had fraudulently obtained, *see* JA112, and his banking and financial records would have told the story of what happened to those fruits of his wire fraud. Similarly, it was reasonable for the magistrate judge to infer that if Dales created and uploaded *some* fake tax documents to support his fraudulent applications, he likely created but did not use *other* fake tax documents as well.

Next, the affidavit established probable cause to believe that Dales's records would be found in his residence. No one disputes there was probable cause to believe that the Anthem House apartment was Dales's residence.[10] The issue is whether the

---

[10] The affidavit stated that "Bozzuto, the management company for Anthem House, provided records showing that on or about January 22, 2022, Dales signed a one-year lease for [the apartment]." JA119-120. Dales's Maryland Department of Labor and Maryland Motor Vehicle Administration records listed the apartment as his residence. JA120-121. So did his Amazon and PayPal accounts. JA120-121.

magistrate judge properly made the "practical, common-sense decision [that], given all the circumstances set forth in the affidavit . . . there is a fair probability" that the records would be found in the residence. *United States v. Robinson*, 275 F.3d 371, 380 (4th Cir. 2001) (quoting *Gates*, 462 U.S. at 238).

The affiant, Agent Gorman, explained that he knew based on his "training and experience" that it is common for fraudsters to keep records, including "records of fraud" and "other papers relating to the commission of fraudulent applications," in "secure locations within residences." JA104. Although Agent Gorman's training and experience in investigating fraud were "unquestionably relevant to the existence of probable cause," *Robinson*, 275 F.3d at 380, this Court has "held that an affidavit need not directly link the evidence sought with the place to be searched," *United States v. Jones*, 942 F.3d 634, 639 (4th Cir. 2019). So even if Agent Gorman had not explained why he had probable cause to believe that Dales's personal papers would be found in his home, the magistrate judge could still establish on his own a nexus between those records and Dales's home by attending to "the nature of the [records] and the normal inferences of where one would likely keep such evidence." *Id.*; *see also United States v. Anderson*, 851 F.2d 727, 728-29 (4th Cir. 1988). As this Court and others recognize, one may reasonably infer that a suspect's personal papers (like his tax documents) will be stored where he resides. *See United States v. Rhynes*, 206

29

F.3d 349, 376 (4th Cir. 1999) (holding that there was "probable cause to believe that the business and personal financial records, etc., of defendant would be located at his personal residence" because they were "the types of records and personal papers which are not ordinarily destroyed or moved about from one place to another"); *United States v. Comstock*, 412 F. App'x 619, 622-23 (4th Cir. 2011) (unpublished after argument) (stating that "many items referred to in the search warrant, including sales receipts . . . and cancelled checks, are items that one would expect a person to retain at home," and holding that it was "reasonable for the magistrate to believe that such evidence of [the defendant's] gun possession would be found at [his] residence, notwithstanding the passage of time" and the removal of "all his firearms" from the home months earlier); *see also United States v. Harris*, 369 F.3d 1157, 1166 (10th Cir. 2004) (holding that an affidavit showed probable cause to search a defendant's residence, even though it did "not allege that any suspected [crime] occurred at the residence," because "the police were interested in searching the residence to obtain records detailing defendant's personal and financial information"); *United States v. Reyes*, 798 F.2d 380, 382 (10th Cir. 1986) (holding that it is "reasonable to assume that certain types of evidence would be kept at a defendant's residence" like "records regarding [the defendant's] activities"); *United States v. Freeman*, 685 F.2d 942, 952 (5th Cir. 1982) (concluding that "bank records" are "the sort [of items] which would

30

normally be kept at one's personal residence" for "long periods of time"). In sum, it is reasonable to infer that people keep their personal papers in their residence.

To be sure, Dales changed residences between when he uploaded his fake tax records to his fraudulent applications and when federal agents obtained a warrant to search his home. But it is in the very nature of personal papers and tax records that they are normally "kept at one's personal residence," *Freeman*, 685 F.2d at 952, and are "not ordinarily destroyed," *Rhynes*, 206 F.3d at 376. So when Dales "moved to a new apartment, probable cause moved with him." *United States v. Martinez*, 106 F.3d 402, at *2 (6th Cir. 1997) (unpublished table decision) (holding that magistrate judge reasonably inferred that when defendant moved to a "new apartment," he took his "business and financial records" with him). Indeed, the district court concluded as much, finding it was "more reasonable [to infer] that [Dales] took the financial records with him than [that] he would have left them at the VOA [halfway house]" or other prior residence. JA354. That conclusion was proper: It would defeat the very purpose of retaining personal papers and records if they were discarded whenever one moved. The papers are valuable in themselves—as a record, whether authentic or fake, of the facts that a person may want to prove one day.

Moreover, when Maryland granted Dales's UI claim and awarded him more than $25,000 in August and September 2021 based on the information in the "false

and fraudulent" tax forms he had uploaded, JA112, he had additional reason to retain those forms and move them (along with his other belongings) to his new apartment. Simply put, the forms had succeeded in defrauding Maryland and convincing it that he was a self-employed barber whose sole proprietorship had made a "net profit of $99,081.35" in 2019, before he stopped being able to provide services in the early months of the pandemic. *See* JA109-111. Having persuaded Maryland of that false narrative, Dales had every reason to retain the related tax forms for further fraudulent use (and not merely as a document of the fraud he had pulled off). *See* JA114. In any event, Dales provided the district court with no reason to believe that he did not bring his personal papers (whether in hard copy or electronic format) to his new residence. *See United States v. Aljabari*, 626 F.3d 940, 945 (7th Cir. 2010) ("Simple common sense supports the inference that one likely place to find evidence of a crime is the suspect's home, *at least absent any information indicating to the contrary.*" (emphasis added)). So he forfeited any such argument, *United States v. Hicks*, 64 F.4th 546, 553 (4th Cir. 2023) ("[W]e review arguments the defendant failed to raise in his suppression motion or hearing only for plain error."), and cannot show that the district court plainly erred by not reaching the opposite conclusion *sua sponte*.

The "tax records" for Dales and his purported business entities were not the only type of record that the affidavit established probable cause for. *See* JA133. To

take another example (among others), the affidavit also showed probable cause to search his home for "financial records," including "bank statements" and documents "relating to financial . . . transactions." *See id.* About four months after Maryland paid Dales $25,570 in fraudulently obtained benefits, *see* JA112, he rented a luxury apartment—the warrant's target residence—at more than $3,000 per month, JA119-120. So, in a span of months, he moved from a halfway house to Anthem House. *See* JA108, JA116. Although the magistrate judge could reasonably infer that Dales had used some of the $25,570 to pay rent at Anthem House, the magistrate could infer that Dales had also used the funds for other purposes and that his bank and financial records would document his receipt and spending of those funds. *Harris*, 369 F.3d at 1166 (holding that police had probable cause to search residence for "defendant's personal and financial information" to "document" his "expenditures" of criminal proceeds); *see also Frey v. Johnson*, 54 F.3d 773, at *2 (4th Cir. 1995) (unpublished table decision after argument) (holding that where the affidavit showed defendant had "written at least six bad checks under the name of [a] non-existent [company]" and "was using credit cards in the name of [others]," there was "probable cause that . . . a search [of his apartment] might yield . . . bank statements, or other items connected with these crimes"). For these reasons (and more), the magistrate had a substantial basis to find probable cause to search Dales's apartment.

33

**2.** **The affidavit established probable cause to search Dales's residence for electronic devices and the electronic records contained therein.**

The second main group of items that the warrant affidavit provided probable cause to search for was, as the government argued below, "electronic devices and electronic records contained therein." JA344; *see also* JA134 (warrant application seeking authorization to search for those devices and records insofar as they "may constitute instrumentalities of, or contain evidence related to the specified criminal offenses"). It is undisputed that Dales "submitted" all the fraudulent "applications and supporting documents . . . electronically via the internet." JA109. Indeed, Dales told the district court that it was "most likely" that the applications were submitted "by computer" because "documents were uploaded with the applications." JA231; *see also* JA281-284 (showing that Dales used mobile and non-mobile devices to log onto the Maryland Department of Labor's website between December 2020 and July 2021 and that he continued to use both to log onto the website for at least another year). And it was reasonable for the magistrate judge to infer that Dales had used his *personal* electronic devices to upload and submit the applications and documents.

The affidavit showed that Dales's cellphone was "activated on December 10, 2020," which was "the day after Dales began residing at the VOA Halfway House," JA118 & n.8, providing probable cause to believe that Dales could and did possess his own electronic devices at the halfway house. After he moved out of the halfway

house in early June 2021, JA108, he reopened his previously denied unemployment-insurance claim in late July 2021 and uploaded two fake tax documents, JA110-112. So in his post-halfway-house residence(s), Dales continued to possess the electronic devices he needed to perform those online operations. Further, Dales had multiple email accounts and at least one Apple ID account where his cellphone served as the account's phone number. JA116, JA118-119. And those were *only some* of the email and Apple ID accounts that Dales maintained. *See* JA116-117.

It was reasonable for the magistrate judge to infer that someone with such a heavy internet presence who had uploaded several documents and submitted several applications online had used a personal computer for at least some, if not all, of those online activities. *See Jones*, 942 F.3d at 639-40 (holding that where defendant made threatening Facebook posts, "the magistrate reasonably could have inferred that [he] had made his online threats from a computer located at his home"). By definition, a personal home computer is generally more private, secure, and accessible than any other. Indeed, this Court in *Jones* took it as given that when a person makes online threats, it is reasonable to infer that the threats were made "from a computer" and that the computer was "located at [the person's] home." *Id.*; *see also United States v. Turner*, No. 22-10194, 2023 WL 5696053, at *2 (9th Cir. Sept. 5, 2023) (holding "[t]he residential warrant was supported by probable cause" to search "for evidence

of forgery-related offenses" because "the affidavit described the particular devices used for the forgeries, like a computer, and it is reasonable to infer that [defendant] kept such devices in his home"). What is more, *nothing* in the affidavit or the greater record suggested that Dales used *only* other people's electronic devices to commit his online wire frauds. Indeed, *nothing* showed that he *ever* used anyone else's device to commit those frauds. So the magistrate's inference was reasonable.

What is more, the affidavit noted that Dales's December 2020 unemployment-insurance claim was submitted from the IP address at his then-residence, the VOA halfway house. JA109. As the government mentioned below (and the district court agreed), a device "log[ged] onto [the] Wi-Fi" at the halfway house would "be using that entity's IP address." JA359. So the record showed that Dales had submitted the claim online from his then-home, underscoring that it was reasonable to infer that he had committed all his wire frauds from a personal computer at home. Moreover, because a computer retains evidence of a person's crimes even after the person tries to delete it, *see* JA123-124, it is reasonable to infer that the person would not run the risk of leaving that evidence on someone else's computer for others to find.

Although Dales moved into a new residence between the time of his known fraudulent conduct and the search of his residence, electronic devices like computers and cellphones are the sorts of things that a person takes with them when moving

36

from one home to another. *See United States v. Richardson*, 607 F.3d 357, 371 (4th Cir. 2010) (holding "the issuing magistrate [had] a substantial basis for concluding that there was a fair probability that the computer Richardson used to engage in these unlawful activities [in his old residence] was kept in his current residence"); *United States v. Epps*, 570 F. App'x 197, 200 (3d Cir. 2014) ("we have never required the government to prove that a computer used for uploading [unlawful materials] in a former residence was actually moved to a new residence before authorizing a search of the new residence" because "the magistrate reasonably could have inferred that [the defendant] would take the computer with him"). So the magistrate reasonably inferred that when Dales moved into Anthem House, he brought his computer(s) and cellphone(s) with him. Indeed, when agents received the search-warrant returns for Dales's Apple ID accounts in the two months before they obtained the search warrant for his Anthem House apartment, they saw that the accounts contained a series of fake driver's licenses, state IDs, and earning statements, including one that purported to show that Dales had made more than $60,000 from a production company in 2020 when, in reality, he was incarcerated for that entire year. JA117-118. That, too, gave the magistrate reason to believe that Dales's internet-based crimes were ongoing and that he still had a personal computer at home. But even without that evidence from Dales's Apple ID accounts, the magistrate had no reason to believe that Dales would

37

have discarded his computer (or any other device) over the past couple years when Dales had no reason to believe that the agents were onto him.

The affidavit also provided probable cause to search Dales's Anthem House apartment for his cellphones. The affidavit explained how Dales had "activated" a cellphone assigned phone number 443-652-7684 "the day after [he] began residing at the VOA Halfway House" and that the cellphone was still "Active." JA118 & n.8. Indeed, Dales had used the cellphone to call Anthem House and communicate with his probation officer, had listed the cellphone's number as his contact number on the fraudulent EIDL and PPP applications for his alleged businesses, and had provided the cellphone as the "recovery phone number" for the Gmail account that he used as his email address on all the fraudulent applications he submitted. JA115, JA118-119. Agent Gorman explained that he knew that fraudsters "use cellular telephones . . . to identify programs or victims they plan to defraud" and that they also use cellphones to "access [their] multiple accounts" online, including iCloud and Google accounts. J103. So there was probable cause to believe that Dales's cellphone would contain evidence of how he came to identify the EIDL and PPP programs as ones he wanted to defraud and that the cellphone would also show Dales accessing the Google email account that each of the fraudulent applications listed as the applicant's contact email address, furthering confirming that Dales was the person behind the wire frauds and

38

defeating any claim that "someone other than [him] could have used his information" to file the fraudulent applications. JA246. Even if Dales had tried to delete all this information from his cellphone, the affidavit explained that "traces" of it were likely still present in the cellphone's "storage medium." JA123.

Also, as noted, one of Dales's Apple iCloud accounts contained evidence of additional unknown wire frauds, including an earnings statement that purported to establish that he had earned more than $60,000 from a production company in 2020 when, in reality, he was incarcerated for the entire year. JA118. Considering how all his other wire frauds involved fraudulent representations that he was working and earning an income during the time he was incarcerated, *see* JA111-114, there was probable cause to believe that Dales had committed (or at least attempted to commit) another wire fraud based on the fraudulent earnings statement. Because that earnings statement probably was saved to the iCloud account from one of Dales's electronic devices, there was also probable cause to believe that those devices would contain other evidence of this as-yet-unknown additional wire fraud.

So for all these reasons and more, *see* JA133-136 (listing other specific items the magistrate judge found probable cause to search the apartment for), the warrant affidavit provided probable cause to search Dales's residence.

**3.      Dales's arguments against probable cause are meritless.**

Dales's challenge to the sufficiency of the warrant affidavit takes a blinkered (and frankly inaccurate) view of both the facts in the affidavit and the caselaw.

Dales spills a tremendous amount of ink arguing that there is probable cause to search a residence when there is "specific information linking the residence to the target offense." AB24. Of course that's true. But that isn't the only circumstance in which there is probable cause to search a home. As this Court held in *Anderson*, even when a warrant affidavit contains "absolutely no facts or conclusions that the [items to be seized] were located in [the suspect's] residence," a "nexus between the place to be searched and the items to be seized may [still] be established by the nature of the item and the normal inferences of where one would likely keep such evidence." 851 F.2d at 729. Under this governing rule, a residential search warrant is upheld so long as it "was reasonable for the magistrate to believe that the [evidence] would be found in [the] residence." *Id.* No "positive evidence" that the items might be found there is required. *Id.*; *accord Aljabari*, 626 F.3d at 944 ("we have made clear that direct evidence linking a crime to a particular place . . . is not essential to establish probable cause to search that place"). "The necessity of this rule is obvious; often, nothing will *directly* indicate that evidence of a crime will be found in a particular place." *Aljabari*, 626 F.3d at 944.

Dales nonetheless relies heavily on dictum in *United States v. Lalor*, 996 F.2d 1578 (4th Cir. 1993), that, "[i]n this and other circuits, residential searches have been upheld only where some information links the criminal activity to the defendant's residence" and that "[w]here no evidence connects the [] activity to the residence, the courts have found the warrant defective." *Id.* at 1583 (quoted in AB21). That was dictum because the holding in *Lalor* was that the warrant affidavit there was "*devoid of any basis* from which the magistrate could infer that evidence of drug activity would be found at [the residence]." *Id.* at 1582 (emphasis added); *see also United States v. Grossman*, 400 F.3d 212, 217, 218 n.1 (4th Cir. 2005) (distinguishing *Lalor* on this ground after holding that "it is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key"). So *Lalor* had no need to opine on whether "information" or "evidence" is always required to connect the items to be seized to the places to be searched. *See Payne v. Taslimi*, 998 F.3d 648, 654-55 (4th Cir. 2021) (defining "dictum").

To be sure, *Lalor*'s dictum is not necessarily inconsistent with *Anderson*'s holding that the "nexus" can "be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *Anderson*, 851 F.2d at 729. If information establishes probable cause to believe that a defendant possesses evidence of a crime, that information would link the crime to the defendant's home

whenever it is reasonable to infer that the defendant likely keeps the evidence there. *Anderson*, itself, was such a case: The affidavit provided probable cause to believe that the defendant possessed a gun and silencer involved in a murder—he had offered to sell them to people who informed on him—but it contained "absolutely no facts or conclusions" about where the defendant was keeping those items. *Id.* at 728-29. The affidavit nonetheless showed probable cause to search his residence because, as noted, it "was reasonable for the magistrate to believe that the defendant's gun and silencer would be found in his residence." *Id.* at 729. If, on the other hand, *Lalor*'s dictum is read as requiring "positive evidence" linking "the place to be searched and the items to be seized," it would then conflict with the holding in *Anderson*. *See* 851 F.2d at 729; *see also United States v. Orozco*, 41 F.4th 403, 411 n.9 (4th Cir. 2022) (recognizing *Anderson*'s holding); *United States v. Williams*, 974 F.2d 480, 482 (4th Cir. 1992) (same). Only a holding binds future panels, whereas dictum does not. *See Payne*, 998 F.3d at 654-55. But even if Dales were to argue that *Lalor*'s evidentiary requirement is a holding and not dictum, this Court "follow[s] the bright-line rule that the first-decided case controls," *United States v. Mitchell*, 120 F.4th 1233, 1239 (4th Cir. 2024), which would be *Anderson* (from 1988), not *Lalor* (from 1993). And, as explained, the magistrate reasonably inferred based on the "nature of the item[s]" to be seized that they "would likely" be found in Dales's residence. *See Anderson*,

851 F.2d at 729. That is especially true "given [this Court's] deferential standard of review." *United States v. Ramos-Cruz*, 667 F.3d 487, 502-03 (4th Cir. 2012).

Dales argues next that the magistrate judge's probable-cause finding "turned mainly," if not "almost entirely," on there being probable cause to search his home for his "mobile phone." AB36. That is blatantly false. The warrant affidavit showed probable cause to search Dales's apartment for a long list of items of which "cell phones" was simply one item near the end. *See* JA133-134. That the magistrate judge found probable cause to search the apartment for *all* the items, JA96, belies Dales's self-serving notion that probable cause was found "mainly" or "almost entirely" for only his mobile phone. AB36. What is more, the government noted below that there was probable cause to search Dales's apartment for *at least* "two broad categories of items": (1) "electronic devices and [the] electronic records contained therein," and (2) "financial records, IRS documents, . . . bank account statements, bills, and [other] documents pertaining to [the programs Dales had defrauded]." JA344; *see also* JA73 (similarly identifying "electronic devices" and "other evidence including financial records"). The district court, too, recognized that the warrant "was broader than just simply searching [for] an electronic device" and that it "also sought records" from the apartment, including "IRS records." JA378. Only Dales persisted in the baseless idea that the magistrate's probable-cause finding somehow turned on his cellphone.

43

*Compare* JA370 (Dales: "The Government's position is that once a person commits wire fraud there's an electronic record, and they can search a person's house to find a cell phone at any time."), *with* JA360 (Government: "The defense claims that the Government's position [is] that simply because the Defendant might have a cell phone that the Government can search the Defendant's residence. That's not even close to the Government's position or what's taken place in this case."). This Court should reject Dales's suggestion that the warrant's validity turns on whether there was probable cause to search for only one of the long list of items that the magistrate found probable cause to search for. *See* JA133-137.

Dales claims that "electronic equipment and data" containing evidence of an internet-based crime will probably be recovered from a suspect's home only in cases "involv[ing] child pornography." AB23. But that isn't right. Child pornographers are far from the only people who have computers and cellphones in their homes. *See, e.g.*, *Jones*, 942 F.3d at 639-40 (holding that it was reasonable to infer that someone posting threating Facebook messages did so "from a computer located at his home"). And digital files containing child pornography are hardly the only files that stick around. As Dales recognizes, digital files "persist for a long time," and even when the files have been deleted, "a computer expert is still likely to retrieve" them. AB24 (quoting *United States v. Krueger*, 145 F.4th 460, 465 (4th Cir. 2025)).

44

Dales asserts that because the magistrate judge "did not know if [he] had the same mobile phone" (or computer, for that matter) in January 2023 that he did after moving to the VOA halfway house in December 2020, there was no probable cause to search his home for such devices. AB27. Probable cause, however, "does not deal with hard certainties, but with probabilities." *Gates*, 462 U.S. at 231. And though it may be reasonable in some circumstances to infer that a person always gets a new computer or cellphone every year or two, that is hardly the *only* reasonable inference to be drawn, especially where, as here, there was no indication whatsoever that Dales regularly replaced his electronic devices with new ones *and* discarded the old ones. As Judge Posner has noted, although it is "*possible* that [a] computer will have been sold or physically destroyed" if enough time passes, this possibility "rarely will . . . be *so* probable as to destroy probable cause," including probable cause to search "the premises where the computer [i]s expected to be found." *United States v. Seiver*, 692 F.3d 774, 777 (7th Cir. 2012); *see also Richardson*, 607 F.3d at 371; *Epps*, 570 F. App'x at 200. That said, nothing in the record suggested that Dales had gotten a new computer or cellphone and discarded his old ones. The magistrate fairly inferred that Dales likely had the same computer and cellphone in January 2023 as those he likely used when committing the wire frauds. *See Bosyk*, 933 F.3d at 326 (recognizing that probable cause may be based on a "series of plausible inferences").

Dales also says that the government conceded below that there was no "reason to believe [his] physical phone had anything beyond what [agents] recovered in prior searches." AB27. That is wrong. Dales cites a few sentences from the suppression hearing, where the government said that "if [Dales had] a new phone," he could have downloaded from his Apple iCloud accounts the "contents" of older phones. AB11 (quoting JA348). The government did not thereby concede that Dales replaced the cellphone he activated in December 2020, *see* JA118; nothing in the record indicated that he had done so. And if (as was most likely) Dales still had the same cellphone and computer as when he committed the wire frauds, nothing indicated that he had uploaded everything on those devices to his cloud-based accounts. In any event, even if Dales had a new cellphone that only contained files downloaded from his iCloud accounts, the fact that the new cellphone had logged onto those accounts, as well as any of the other accounts tied to the wire frauds, would have established that those accounts were indeed Dales's, thereby linking him to the suspicious materials they contained and undercutting his idea that they may have been created by "someone" unlawfully "using [his] name and personal information," JA246. So regardless of whether he had the same phone or a new phone, there was probable cause to believe that the phone itself had independent evidentiary value.

According to Dales, because people generally take their cellphones with them, there was probable cause to search only his person for his cellphone and not also his apartment. AB40-41. But that assumes—without developed argument—that there is probable cause to search only one place at a time for an item. To the contrary, the magistrate judge could reasonably infer that Dales's cellphone would be found either on his person or in his apartment—in part because it is reasonable to infer based on common experience that whereas people often keep their cellphones on their person when outside their homes, they often set down their cellphones someplace else when inside their homes. In any event, Dales waived this point by conceding below that there was "probable cause that he had his cell phone" "in his apartment." JA369.

Dales asserts that if the affidavit "identified no particular physical evidence or electronic equipment that was probably at [his] residence," there was no probable cause to search it. AB27. But the affidavit identified several *particular categories* of evidence and equipment that there was probable cause to search for, including "tax documents," "financial records," "computer(s)," and "cell phones." JA133-134. If Dales meant instead that there cannot be probable cause to search a place unless the magistrate judge can identify in advance the *particular pieces* of evidence that are located in the place, he provides no authority to support that novel requirement. *See* AB27. In any event, it is belied by this Court's precedents. Take, for example, the

47

Court's decision in *Williams* affirming a magistrate's conclusion that "there was a fair probability that drug paraphernalia would be found in [a known drug dealer's] motel room," 974 F.2d at 482, even though the warrant affidavit did not identify any particular piece of drug paraphernalia that would likely be found there, *id.* at 480-81 (setting forth facts "summariz[ed]" in the affidavit). Moreover, requiring affidavits to identify in advance the specific items that there is probable cause to search for would be precisely the sort of "[t]echnical requirement[] of elaborate specificity" that the Supreme Court eschewed long ago. *See Gates*, 462 U.S. at 236.

Most of Dales's remaining arguments cover terrain that has been discussed above. For example, he asserts that the affidavit provided "no reason to believe a computer was used in [his frauds] or located in [his] residence" and "no reason to believe that [any] records [related to his frauds] existed in any particular place, must less [his residence]." AB41-42. Although these issues have already been addressed, it is worth noting that the suppression record provided no more likely place for where Dales might keep his electronic devices and personal papers than his residence: He did not own a car, JA120; did not appear to have any legitimate business or office, *see* JA109-115; and did not appear to have any other home—the home listed on his Maryland State ID card, *see* JA114-115, was sold by his relative the day after he moved into the VOA halfway house, *see* JA113. In any event, as noted above, it is

undisputed that the Anthem House apartment had been Dales's residence for a full year at the time of the search, and it is reasonable to infer that a person usually keeps his electronic devices (especially computers) and personal papers at home.

Indeed, this Court has recognized that "there are places so intrinsically part of a person's daily life," such as their "residence," "that one would expect evidence of their crimes to be found there." *Orozco*, 41 F.4th at 411 n.9; *see also United States v. Young*, 847 F.3d 328, 346 (6th Cir. 2017) (affirming that "an issuing judge may infer that a criminal suspect keeps the 'instrumentalities and fruits' of his crime in his residence"); *Aljabari*, 626 F.3d at 945 (similar). So Dales is wrong to assert that only child pornographers are "likely to keep evidence of a crime" at home. AB43.

Finally, Dales says that *United States v. Mora*, 989 F.3d 794 (10th Cir. 2021), which he cites for the first time on appeal, provides "persuasive" reasons to reverse the district court. AB32. But *Mora* is a factually distinctive case where officers who had "never seen" the type of crime the defendant was suspected of committing, *id.* at 806 n.2 (Tymkovich, C.J., concurring), obtained a warrant to search his residence mere hours after they learned of him and his alien smuggling for the very first time, *id.* at 797-98. Because a critical part of the warrant affidavit relied on observations of firearm offenses that the officers made during an illegal unwarranted search of the residence, the government tried to argue that the remaining parts of the affidavit

49

nonetheless provided probable cause to search the residence for evidence of alien smuggling. *Id.* at 799-800. But all that the officers knew about the defendant's alien smuggling was that he apparently brought dozens of illegal aliens into town in his tractor trailer that morning, dropping them off behind a local supermarket, and that he then parked his tractor trailer in a nearby lot before being picked up by his wife in a car. *Id.* at 797-98. The officers so quickly figured out who the defendant was (by pulling the tractor trailer's registration), they were able to get to his house before he and his wife did, arresting them when they arrived and seizing their cellphones. *Id.* at 798. In the circumstances, a panel of the Tenth Circuit held that there was no probable cause to then search the defendant's home. *Id.* at 803.

The panel held that probable cause to search the defendant's residence did not exist merely because he had "engaged in alien smuggling" by driving the aliens from an unknown origin to the back of the supermarket. *Mora*, 989 F.3d at 801. Although the warrant affidavit asserted that alien smugglers "often use" various "tools of the smuggling trade" that might be found in a home, the panel dismissed those assertions as "an afterthought" because they were included in "one hand-written paragraph at the bottom of [the] otherwise typed, four-page [affidavit]." *Id.* at 801 & n.3. What is more, nothing indicated that the defendant "possessed, let alone used, any of [those tools] in connection with alien smuggling." *Id.* at 801-02. Although the panel found

50

that a magistrate "could reasonably infer that [the defendant kept electronic records of his smuggling] on a cell phone," the defendant "did not have a chance to hide any evidence he ferried with him in his home before officers apprehended him and seized the item [*i.e.*, his cell phone] most likely to contain alien smuggling records." *Id.* at 802. The panel also said that there was no reason to believe that the defendant likely "stored records" in his home when he "effectively" ran "his office" out of "his tractor trailer cab." *Id.* at 803. Because nothing "link[ed] Defendant's alien smuggling to his home," there was no probable cause to search it. *Id.*

There is simply no comparison between the deficient four-page affidavit in *Mora* and the detailed 26-page affidavit in this case, which provided probable cause to believe that Dales had used several items that are likely and even ordinarily kept at home (from personal computers to personal papers and records) in committing the suspected wire frauds. The months-long investigation into Dales had uncovered, as described above, several items that would likely be found in his residence that were evidence, fruits, or instrumentalities of the wire fraud. Although Dales nit-picks the agents' investigation and highlights a few other avenues they could have pursued before seeking the challenged warrant, an officer is not required to "exhaust every potential avenue of investigation before seeking and obtaining a warrant." *United States v. McNeal*, 818 F.3d 141, 151 (4th Cir. 2016). Thus, *Mora*—and the materially

51

different facts that led to its outcome—does not shed any light on the circumstances and affidavit here. *See Wadkins v. Arnold*, 214 F.3d 535, 539 (4th Cir. 2000) (stating that "probable cause is an individualized and fact-specific inquiry"); *see also United States v. Glass*, 160 F.4th 563, 569 (4th Cir. 2025) (distinguishing *Mora* as a case merely about a residential search warrant "for portable communications devices where, crucially, the police had *no* reason to think" that the defendant "even owned" any beyond those that had already been seized).

*   *   *   *   *   *   *

In sum, the magistrate judge "had a substantial basis for finding probable cause" to issue a search warrant for Dales's residence based on the detailed 26-page affidavit setting forth the findings of the agents' months-long investigation into his wire frauds. *See Ordonez-Zometa*, 141 F.4th at 555.

52

**II.** **If the magistrate judge did not have a substantial basis for his probable-cause determination, the district court properly found that suppression is still not warranted because of the good-faith doctrine.**

**Issue:**

Dales asserts that if the warrant affidavit is deficient, suppression is necessary because the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." AB50.

**Standard of Review:**

This Court "should not suppress evidence discovered 'under the authority of a warrant, even a subsequently invalidated warrant, unless a reasonably well-trained officer would have known that the search was illegal despite the [magistrate judge's] authorization.'" *United States v. Wellman*, 663 F.3d 224, 228 (4th Cir. 2011).

**Analysis:**

In the event Magistrate Judge Coulson lacked a substantial basis to find that the warrant affidavit showed probable cause to search Dales's apartment, the district court properly found that the good-faith doctrine applies and thus that suppression is not warranted. *See* JA378.

The exclusionary rule's "sole purpose" is to "deter future Fourth Amendment violations," and it applies only where this purpose is "most efficaciously served." *Davis v. United States*, 564 U.S. 229, 237 (2011). Because suppressing evidence

"exacts a heavy toll on both the judicial system and society at large," society "must swallow this bitter pill when necessary, but only as a 'last resort.'" *Id.* Thus, "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful," "exclusion cannot 'pay its way.'" *Id.* at 238 (quoting *United States v. Leon*, 468 U.S. 897, 909, 908 n.6 (1984)).

The mere fact "that a neutral magistrate has issued a warrant is the clearest indication that the officers [executing it] acted in an objectively reasonable manner." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). Although that fact "does not end the inquiry" into whether the officers acted in "objective good faith," *id.* at 546-47, there are only "four limited situations" where the good-faith doctrine does not apply, *Wellman*, 663 F.3d at 228. The "threshold for establishing" that "an affidavit [was] so lacking in probable cause as to render official belief in its existence entirely unreasonable" is "a high one." *Messerschmidt*, 565 U.S. at 547. Indeed, a "warrant is so deficient in indicia of probable cause when it has an 'error that is apparent from a "simple glance" at the face of the warrant itself, not a defect that would "become apparent only upon a close parsing of the warrant application."'" *Smith v. Munday*, 848 F.3d 248, 256 (4th Cir. 2017); *accord Messerschmidt*, 565 U.S. at 555-56.

The warrant that Magistrate Judge Coulson issued based on Agent Gorman's detailed 26-page affidavit is simply not the sort of facially deficient warrant that no

reasonably trained officer could objectively rely on. Dales nonetheless tries to get some mileage out of the district court's statement that the affidavit's sufficiency was "a little bit [of a] closer call than what would normally be the case." AB57 (quoting JA378). As an initial matter, it is not clear what the court meant by that statement because its analysis did not otherwise show any doubt about the warrant's validity. In any event, this Court does not defer to the district court's assessment of probable cause; instead, it shows "great deference" only to the magistrate judge's assessment. *Ordonez-Zometa*, 141 F.4th at 555. And where, as here, multiple judges have signed off on the warrant's sufficiency, one "cannot say that it was objectively unreasonable for the government to rely on [it]." *Bosyk*, 933 F.3d at 333.

Dales nonetheless says—based on the Tenth Circuit's 2021 decision in *Mora* and an even older D.C. Circuit case—that there is a "recurring problem" of officers obtaining residential search warrants for "mobile phones" using only "boilerplate" allegations. AB60. But that is not what happened here, as even a short summary of the warrant affidavit shows. *See supra* pp. 8-16. In any event, three cases in three circuits in the past decade is not a "recurring problem," but rather a baseless attempt to make this case seem more significant than it is.

In sum, no reasonably well-trained officer would glance at this warrant and conclude that it was facially deficient. Thus, suppression is not warranted.

## CONCLUSION

The Court should affirm Dales's judgment of conviction.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

/s/ David C. Bornstein
Assistant United States Attorney
Chief, Appellate Division
United States Attorney's Office
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 290-4800

## CERTIFICATE OF COMPLIANCE

This corrected brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B) because it contains <u>12,891</u> words, excluding the parts exempted under Fed. R. App. P. 32(f).

This corrected brief also complies with the typeface requirements set forth in Fed. R. App. P. 32(a)(5) and the type-style requirements in Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced serif typeface and plain, roman style using Times New Roman in 14 point.

Dated: January 5, 2026          <u>/s/ David C. Bornstein</u>
                                           Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2026, I electronically filed this corrected brief with the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system and thereby electronically served a copy of it on Appellant Ryan Dales through his counsel of record, who is a registered ECF Filer.

Dated: January 5, 2026          <u>/s/ David C. Bornstein</u>
                                           Assistant United States Attorney