No. 25-4202

In The
# United States Court of Appeals
# for the Fourth Circuit

United States of America

*Appellee*

v.

Ryan E. Dales a/k/a Ryan Dales

*Appellant*

On Appeal from the United States
District Court for the District of
Maryland,
No. 1:23-cr-00026-GLR-1

## Appellant's Reply Brief

Steven M. Klepper
Bruno P. Babij
KRAMON & GRAHAM, P.A.
750 East Pratt Street, Suite 1100
Baltimore, MD 21202
(410) 752-6030
sklepper@kg-law.com
bbabij@kg-law.com

*Appointed Counsel for Appellant*

# Table of Contents

Table of Contents ...................................................................................ii

Table of Authorities................................................................................ iii

Summary of Argument............................................................................1

Argument.................................................................................................4

    I.    The Government's arguments confirm there was no
probable cause. ..............................................................................4

        A. The Government violates Supreme Court precedent
by citing evidence discovered in the search. ......................4

        B. Dales's status as a suspected "fraudster" did not
provide probable cause to search his residence. ...............6

           1. The affidavit supplied no probable cause to search
Dales's residence for papers evidencing fraud. .............6

           2. The affidavit supplied no probable cause to search
the Target Residence for electronic devices...................9

        C. By running from the Court's decisions in *Lalor* and
*Anderson*, the Government drives home how the
search violated settled law. ...........................................12

    II.    The Government cannot demonstrate good faith through
the affidavit's length..............................................................18

Certificate of Compliance...................................................................22

Certificate of Service .........................................................not numbered

# Table of Authorities

*Florida v. Jardines*, 569 U.S. 1 (2013) ....................................................... 3

*Payne v. Taslimi*, 998 F.3d 648 (4th Cir. 2021) ........................................ 13

*Pittston Co. v. United States*, 199 F.3d 694 (4th Cir. 1999) ................... 13

*United States v. Allen*, 631 F.3d 164 (4th Cir. 2011) ............................... 8

*United States v. Anderson*, 851 F.2d 727 (4th Cir. 1988) ........... 15, 16, 17

*United States v. Banks,* 540 U.S. 31 (2003) ............................................ 5

*United States v. Di Re,* 332 U.S. 581 (1948) ........................................... 5

*United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017) ............... 12, 20

*United States v. Jones*, 942 F.3d 634 (4th Cir. 2019) ......................... 8, 10

*United States v. Lalor*, 996 F.2d 1578 (4th Cir. 1993)................... passim

*United States v. Lopes*, 578 F. Supp. 3d 158 (D. Mass. 2021) ............... 20

*United States v. Lyles*, 910 F.3d 787 (4th Cir. 2018) ............................. 21

*United States v. Mora*, 989 F.3d 794 (10th Cir. 2021)............... 12, 19, 20

*United States v. Richardson*, 607 F.3d 357 (4th Cir. 2010)............. 11, 17

*United States v. Roach*, 582 F.3d 1192 (10th Cir. 2009) ....................... 14

*United States v. Roman*, 942 F.3d 43 (1st Cir. 2019) ............................ 14

*United States v. Small,* 944 F.3d 490 (4th Cir. 2019)......................... 1, 5

*United States v. Suiero*, 59 F.4th 132 (4th Cir. 2023) ............................ 7

*United States v. Tagg*, 886 F.3d 579 (6th Cir. 2018) ............................. 14

*United States v. Trader*, 981 F.3d 961 (11th Cir. 2020) ....................... 14

*United States v. U.S. Dist. Court (Keith)*, 407 U.S. 297 (1972) ............. 21

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ................................... 15

## Summary of Argument

Page 43 of the Government's brief encapsulates why there was no probable cause or even good faith. There, the Government argues it was dictum when this Court required "information link[ing] the criminal activity to the defendant's residence" in *United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993). *Lalor*'s holding, which is the law everywhere, was not dictum. This principle is why this Court's decisions, including in child-pornography cases, have always recited the information linking the criminal activity to the defendant's residence. By contesting long-settled Circuit law, the Government shows precisely why it cannot even show good faith.

If that were not enough, the Government shows that there was no probable cause or good faith under settled Circuit law by defining the "Underlying Criminal Conduct" (Gov't Br. 3-7) through extensive discussion of evidence recovered through the search rather than through the facts known to the police. *United States v. Small,* 944 F.3d 490, 502 (4th Cir. 2019). The fruit of a search is irrelevant to the search's legality.

The Government acknowledges that the warrant was founded on nothing more than Agent Gorman's boilerplate generalizations, based on

his "training and experience," about the expected recordkeeping practices of "fraudsters." Entirely missing was any information of what Dales in particular likely kept at his residence. The affidavit's few particularities pertain to residences other than—and to acts committed well before Dales moved into—the searched premises. Because Agent Gorman's affidavit was devoid of any "information link[ing] the criminal activity to the defendant's residence," the warrant based on it was invalid under settled law. *Lalor*, 996 F.2d at 1583.

The Government tries to rehabilitate the warrant by suggesting that Agent Gorman's recitation of "training and experience" boilerplate supported a series of "common-sense" inferences establishing probable cause to search the residence: that a "fraudster" like Dales is likely to maintain paper records and electronic devices evidencing his fraud; that a fraudster is likely to maintain these papers and devices in his residence; and that a fraudster is likely to bring these papers and devices with him when he moves to a new residence.

The categorical rule the Government proposes—that if there is probable cause to believe that a person committed fraud, then there is probable cause to believe that the person's current residence contains

evidence of the fraud—threatens the "very core" of the Fourth Amendment: "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). The Government's rule is, in any event, clearly inconsistent with the holding of this Court in *Lalor* that, unless "some information links the criminal activity to the defendant's residence," a warrant for the residence cannot issue. 996 F.2d at 1583. Perhaps recognizing that the Court's holding in *Lalor* forecloses the warrant-by-boilerplate rule it favors, the Government is reduced to contending that the Court's holding in *Lalor* is dicta.

The Government suggests in perfunctory fashion that suppression is unnecessary because the good-faith doctrine applies. But the Government's argument is nothing more than a conclusory assertion that the warrant "based on Agent Gorman's detailed 26-page affidavit is simply not the sort of facially deficient warrant that no reasonably trained officer could objectively rely on." Gov't Br. 54-55. No matter how many pages long or how replete with extraneous "details," an affidavit formed of boilerplate "training and experience" generalizations and devoid of information relating the criminal activity to the residence to be

3

searched cannot supply probable cause. By stressing the affidavit's length, the Government illustrates how Agent Gorman skillfully cast an illusion of probable cause through sheer volume of information that either did not advance the ball or was a red flag that the Government lacked probable cause. This Court should reverse.

## Argument

### I. The Government's arguments confirm there was no probable cause.

#### A. The Government violates Supreme Court precedent by citing evidence discovered in the search.

The "underlying criminal conduct" that the Government describes in its statement of the case consists mainly of conduct and contraband discovered after, and as a result of, the search of his Anthem House residence. To be clear: Agent Gorman's warrant affidavit did not mention the fraudulent purchase and sale of "at least seven high-end lawnmowers," Gov't Br. 4; his possession of "gun-power," Gov't Br. 5; or his possession of drugs or drug paraphernalia, Gov't Br. 5-6.

A court "do[es] not evaluate probable cause in hindsight, based on what a search does or does not turn up," and the lurid details of the offenses have no part in the Court's assessment of whether the Government had probable cause to search his apartment. *Florida v.*

*Harris*, 568 U.S. 237, 249 (2013). "As the Supreme Court has noted, the reasonableness of a search is evaluated based on 'the facts known to the police' at the time." *Small,* 944 F.3d at 502 (quoting *United States v. Banks,* 540 U.S. 31, 39-40 (2003)). "A Fourth Amendment search 'is good or bad when it starts.'" *Id.* (quoting *United States v. Di Re,* 332 U.S. 581, 595 (1948)).

It is beyond the pale for the Government to cite these post-search discoveries to suggest that, before the search, it had information that the Target Offense had continued after Mr. Dales moved to Anthem House. It did not. Exacerbating how these arguments violate settled Fourth Amendment case law, it presents this after-acquired information in the most inflammatory manner possible: citing the pre-sentencing report.

Make no mistake: the Government is "retconning" the record contrary to settled law. If the Government had an argument for probable cause that comports with Supreme Court and Circuit precedent, it would not be citing the pre-sentencing report or anything recovered during or after the search.

**B.** **Dales's status as a suspected "fraudster" did not provide probable cause to search his residence.**

**1. The affidavit supplied no probable cause to search Dales's residence for papers evidencing fraud.**

Having conceded below that there was no reason to suspect that the search would yield electronic records beyond those recovered in the cloud searches, the Government now argues that Agent Gorman's affidavit allows the reasonable inference that Dales maintained paper records evidencing fraud at his Anthem House residence. There is no basis in the affidavit for this inference.

*First*, the Government contends that "the warrant affidavit provided probable cause to believe that Dales had used federal tax forms in committing the wire frauds and that his tax documents and financial records would provide evidence of those offenses." Gov't Br. 27. But none of the affidavit's statements gives any reason to believe that Dales used or generated paper records in the course of the fraud. The Government observes that "Dales 'submitted online' an application for PPP funds"; "'upload[ed]' to his application for unemployment benefits an IRS Form SS-4"; and "uploaded, too, another IRS Form 1040." *Id.* (alteration in original) (quoting JA114). It is an obvious non sequitur, however, to infer—as the Government appears to—that the use of an internet

browser in the course of the fraud necessarily occasioned the creation of "*papers* relating to the commission of fraudulent applications." *Id.* at 29 (emphasis added) (quoting JA104); *see also* JA109 ("All loan applications and supporting documents were submitted by … electronically via the internet[.]"). It is axiomatic that a person can create and transmit a document without ever creating a paper copy of it.

The Government's second and equally unsound premise is that Dales likely maintained these papers (support for the existence of which is, again, missing from the affidavit) in his residence because "fraudsters" customarily secrete papers in their residences. Gov't Br. 29. The only support the Government adduces for this remarkable proposition is Agent Gorman's boilerplate statement, "based on [his] training and experience, that suspects who commit fraud *may* maintain books … and other papers relating to the commission of [fraud] … and that they *may* maintain these items in secure locations … including within their residence(s) and vehicle(s)." JA104 (emphasis added). This empty conjecture is not remotely sufficient to establish a "'*substantial likelihood*'" that papers evidencing fraud would be found in Dales's Anthem House apartment. *United States v. Suiero*, 59 F.4th 132, 140 (4th

Cir. 2023) (quoting *United States v. Allen*, 631 F.3d 164, 173 (4th Cir. 2011)) (emphasis in *Sueiro*).

The Government appears to acknowledge as much, but it suggests that, even absent any meaningful explanation from Agent Gorman of why fraud papers were likely to be found in Anthem House, "the magistrate judge could still establish *on his own* a nexus between those records and Dale's home by attending to 'the nature of the [records] and the normal inferences of where on would likely keep such evidence.'" Gov't Br. 29 (alteration in Gov't Br.) (emphasis added) (quoting *United States v. Jones*, 942 F.3d 634, 639 (4th Cir. 2019)). In fact, however, the "nature" of any records involved in Dales's fraud tends to establish, if anything, that the fraud had no nexus at all to his Anthem House residence. To review: Dales's residence in Anthem House began in January 2022. But the "tax forms" Dales allegedly used in his fraud and that the Government claims justified the search of his Anthem House residence Dales submitted electronically in July and March 2021—half a year before he became a resident at Anthem House. JA110, 114.

The Government also contends that the affidavit established probable cause to search Dales's residence "for 'financial records,'

including 'bank statements' and documents 'relating to financial … transactions.'" Gov't Br. 33 (quoting JA133). The Government reasons, in particular, that a search of Dale's residence was likely to return financial records evidencing fraud because (1) Dales may have used some of the proceeds of his fraud "to pay rent at Anthem House" and (2) "his bank and financial records would document his receipt and spending of those funds." *Id.* But this inference is, again, a patent non sequitur: a person's supposed use of fraud proceeds to pay rent tells us nothing about whether he is likely to have secreted records evidencing that fraud in the rented apartment.

### 2. The affidavit supplied no probable cause to search the Target Residence for electronic devices.

The Government argues that the warrant affidavit allowed the magistrate judge to infer reasonably that because Dales "uploaded several documents and submitted several applications online" before becoming a resident at Anthem House, a search of Dales's Anthem House residence half a year later would likely yield a personal computer or other electronic device containing evidence of fraud. Gov't Br. 35; *see id.* 36. But the Government identifies no pertinent authority establishing the reasonableness of this inference.

9

In *Jones*, the defendant argued that a search of his residence for evidence that he made terroristic threats was unlawful because the warrant affidavit "failed to establish the required nexus between his residence and the evidence sought." 942 F.3d at 637. The Government asserts that the "Court in *Jones* took it as a given that when a person makes online threats, it is reasonable to infer that the threats were made 'from a computer' and that the computer was 'located at [the person's] home.'" Gov't Br. 35 (final alteration in Gov't Br.) (quoting *Jones*, 942 F.3d at 639–40). But if the Court in *Jones* took that much as a "given," it did so only because the affidavit clearly established that the defendant had made the online threats from a computer located in his home: he "stated that no 'pigs' should 'come to my house at all'" and "explicitly warned: 'If pigs come here here [sic] be careful.'" *Jones*, 942 F.3d at 637. The defendant, in other words, made the threats from "here" and specifically identified "here" as "my house." Agent Gorman's affidavit contains no comparable information; indeed, to the extent that it localizes the Target Offense to any particular place, it associates the fraud with a location *different from* than the one actually searched.

The Government also cites *United States v. Richardson*, 607 F.3d 357 (4th Cir. 2010), in support of its contention that the use of a computer to commit fraud at a different residence in December 2020 provides probable cause to search an entirely new residence at Anthem House more than a year later. Gov't Br. 36-37. *Richardson*, the Government insists, establishes as a general matter that "electronic devices like computers and cellphones are the sorts of things that a person takes with them when moving from one home to another." *Id.* (citing *Richardson*, 607 F.3d at 371). But the defendant in *Richardson* committed child pornography offenses, and it is well-established that the nexus requirement in child pornography investigations is less exacting than in circumstances like those attendant here. *See* Opening Br. 23-26. *Richardson* did not establish the general rule the Government attributes to it.

The Government in effect proposes that there is probable cause to search a person's residence whenever there is probable cause to believe that the person used a computer or cell phone to commit fraud—even if, as here, the fraudulent acts in question took place when the defendant lived at a different residence and there is otherwise no information

associating the devices in question with the residence to be searched. This is not a rule that any court has recognized or that this Court should recognize. The Court should instead confirm, as some of its sister courts of appeals have, that "[t]he assumption that a suspect maintains illicit records on a cell phone does 'not automatically justify an open-ended warrant to search a home anytime officers seek a person's phone.'" *United States v. Mora*, 989 F.3d 794, 802 (10th Cir. 2021) (quoting *United States v. Griffith*, 867 F.3d 1265, 1273 (D.C. Cir. 2017)).

**C.** **By running from the Court's decisions in *Lalor* and *Anderson*, the Government drives home how the search violated settled law.**

The Government cannot reconcile this Court's decision in *Lalor*, 996 F.2d 1578, with its position that evidence of fraud categorically justifies the search of a person's residence. *See* Gov't Br. 40–43. In *Lalor*, the Court held that the warrant at issue was "invalid" after observing that, in "this and other circuits, residential searches have been upheld only where some information links the criminal activity to the defendant's residence." 996 F.2d at 1583. The warrant to search the Anthem House apartment does not remotely meet this requirement: the only "link" established by Agent Gorman's affidavit was to residences other than the

12

one searched. *See, e.g.,* JA109 (stating that IP address used in December 2020 fraud resolved to 5000 East Monument Street); JA110 (stating that mailing address of Dales's purported business was "5522 Wesley Avenue in Gwynn Oak, Maryland"); JA113 (stating that mailing address for "DALES DROP" business was "3231 Southgreen Rd, in Windsor Mill MD 21244"). The Government suggests nevertheless that the *Lalor* Court's requirement of "information link[ing] the criminal activity to the defendant" can be ignored as dicta. *Id.*; *see* Gov't Br. 40–41.

This contention is wrong and dangerous. "Dictum is a 'statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding[.]'" *Payne v. Taslimi*, 998 F.3d 648, 654-55 (4th Cir. 2021) (quoting *Pittston Co. v. United States*, 199 F.3d 694, 703 (4th Cir. 1999)). In contrast, it is well-established that, if "necessary to the outcome, a precedent's reasoning must be followed" as holding. *Id.* at 655. The principle that a residential warrant is invalid unless some information links criminal activity to the residence to be searched was necessary to *Lalor*'s holding that the warrant there was invalid. In particular, after stating that "residential searches have been upheld only where some information links the

13

criminal activity to the defendant's residence," the Court in *Lalor* announced its holding in these terms: "*Accordingly*, the warrant in this case is invalid, and the search will be insulated only if an exception to the warrant requirement applies." 996 F.2d at 1583 (emphasis added). What the Government calls "dicta" was, in fact, the "analytical foundation[]" of the Court's holding in *Lalor*, and for that reason it is binding. *Payne*, 998 F.3d at 703.

The Government's contention that the *Lalor* requirement is dicta is especially implausible because some version of the rule has been widely adopted in other circuits—both before *Lalor* (as discussed in that decision) and in later decisions.[1] These holdings reflect that the "critical element in a reasonable search is not that the owner of the property is

---

[1] *See United States v. Trader*, 981 F.3d 961, 969 (11th Cir. 2020) (requiring "a link between the residence and any criminal activity." (citation omitted)); *United States v. Roman*, 942 F.3d 43, 52 (1st Cir. 2019) (noting that "generalized observations" about the behavior of drug dealers "should be combined with specific observations, or facts connecting the drug dealing to the home to permit an inference of nexus to a defendant's residence." (quotation marks and citations omitted)); *United States v. Tagg*, 886 F.3d 579, 587 (6th Cir. 2018) (requiring "some independent evidence linking the residence to the crime"); *United States v. Roach*, 582 F.3d 1192, 1202 (10th Cir. 2009) (requiring "additional evidence linking the person's home to the suspected criminal activity." (citation omitted)).

suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978).

Unable to relegate *Lalor*'s holding to dicta, the Government seeks refuge in a misreading of this Court's holding in *United States v. Anderson*, 851 F.2d 727 (4th Cir. 1988), that the "nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *Id.* at 729; *see* Gov't Br. 42. The Government insists that, even if *Lalor*'s requirement is holding rather than dicta, it is in "conflict" with the Court's decision in *Anderson*. Gov't Br. 42.

No "conflict" exists. In *Anderson*, the warrant affidavit included evidence that the defendant possessed a pistol and that he intended to sell it. 851 F.2d at 728. The Court noted that three courts of appeals had recognized that it is in the "nature" of a weapon that it be stored at a person's residence, and on that basis accepted as reasonable the magistrate's inference "that the defendant's gun and silencer would be found in his residence … even though the affidavit contained no facts

that the weapons were located in the defendant's trailer[.]" *Id.* at 729. An inference that a person known to possess a gun with the intent to sell it is storing that gun in his residence is categorically different from an inference that a person suspected of a past fraud in a former residence has secreted evidence of the fraud in his new residence.

Rather than conflict with *Anderson*, *Lalor* cited *Anderson* four times. *Lalor*, 996 F.2d at 1582. The Court quoted the same holding that the Government now says *Lalor* violated, that "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *Id.* (quoting *Anderson*, 851 F.2d at 729). The *Lalor* affidavit failed that test because, even though the investigators had probable cause to believe the defendant was a drug-dealer keeping cocaine somewhere, the affidavit did "not describe circumstances that indicate such evidence was likely to be stored at Lalor's residence," such as "proximity of the drug sales to Lalor's residence." *Id.* at 1583.

The deficiency here is even worse. Unlike the *Anderson* affidavit searching for a particular firearm, or the *Lalor* affidavit searching for cocaine that was likely stored somewhere, Agent Gorman's affidavit

simply speculated that electronic fraud might have generated paper evidence, or that if Mr. Dales had a computer it might contain evidence.

And nothing linked that hypothetical evidence, if it existed, to Anthem House. Mr. Dales' affidavit flagged that the contemporaneous T-Mobile warrant was expected to yield, but had not yet yielded, surveillance opportunities and historic location data to identify other potential locations of the crimes and evidence thereof. JA119. The Court "has already cautioned the police about the need to specify time periods in warrant applications," *Lalor,* 996 F.2d at 1582 (citing *Anderson,* 851 F.2d at 729-30 & n.1), and the affidavit lacked any dates that overlapped with when Mr. Dales resided at Anthem House.

In sum, the Government's relies on the principle that a residential nexus can sometimes be inferred from the nature of the items sought, while avoiding the key question: Are the circumstances of this case those that the Court has recognized as supporting such an inference? The only reasonable answer is no. Unlike in *Anderson*, the defendant here was not suspected of possessing and intending to sell a weapon. And unlike in *Richardson* and other like cases, the defendant here was not suspected of a child pornography offense. The Government's insistence that the

17

nature and circumstances of the Target Offense were by themselves sufficient support for the warrant does not make it so. This argument is ipse dixit, nothing more.

## II. The Government cannot demonstrate good faith through the affidavit's length.

If this affidavit met the good-faith standard, the Government would not be challenging *Lalor*'s holding as dictum. Nor would the Government be building its probable-cause narrative by citing the pre-sentencing report for facts discovered during and after this unlawful search.

The Government suggests, almost in passing, that suppression is unwarranted because Agent Gorman's litany of boilerplate was so long, and supplemented so liberally with "detail[s]" irrelevant to the residence to be searched, that a reasonable officer could not have known the resulting warrant was deficient. Gov't Br. 54; *see* Gov't Br. 53–55. But an officer cannot earn the application of the good-faith exception simply by obfuscating an affidavit's deficiency with empty boilerplate and irrelevant detail.

The important fact is this: nearly three decades after this Court established that a residential search is justified "only where some information links the criminal activity to the defendant's residence,"

Agent Gorman applied for a warrant to search the Target Residence using an affidavit that, although superficially thorough, established no non-speculative connection between the Target Offense and the residence to be searched. *Lalor*, 996 F.2d at 1583. If *Lalor*'s requirement that an affidavit contain "some information link[ing] the criminal activity to the defendant's residence," is accepted as holding, as it must be, then there is simply no credible basis for maintaining that the good-faith exception applies here. 996 F.2d at 1583. The question of good faith begins and ends with *Lalor*.

The Government accuses Dales of "baseless[ly] attempt[ing] to make this case seem more significant than it is" by bringing attention to the way in which, absent court correction, sophisticated officers can deploy meretricious warrant affidavits to secure entry to just about any criminal defendant's home. Gov't Br. 55. But the problem of facially thorough but substantively empty residential warrant affidavits is significant enough to have attracted the notice of at least two courts of appeals. *See Mora*, 989 F.3d at 800 (noting that "[a]llowing officers to search a home based solely on an affiant's experience and pure speculation would perpetuate th[e] evil" of unjustified government entry

to the home); *Griffith*, 867 F.3d at 1279 (declining to apply good-faith exception because, although "[t]he affidavit [at issue] might have established the authority to seize an individual," it "fell materially short of justifying a search of his home.").

Given the Government's structural advantage in shaping which cases make Fourth Amendment precedent, *Mora* and *Griffith* are more than enough to illustrate this problem's magnitude. Because most trial-level suppression rulings are oral, the number of similar violations is necessarily higher than a search of Westlaw or Lexis would show. To challenge a loss, a defendant must either reject a plea offer or persuade the Government to allow conditional plea (which happened here only after the first of two trials). When the Government loses, it has the luxury of deciding whether to risk making unfavorable law through an appeal. For example, in a rare case when a district court published its ruling, the Government chose not to appeal from the ruling there was neither probable cause nor good faith to search a residence for a cell phone. *United States v. Lopes*, 578 F. Supp. 3d 158, 163 (D. Mass. 2021) ("[T]he affidavit does not elucidate any particularized facts—aside from conclusory statements that an individual's phone may store text

messages and locational data related to a crime—that would suggest that [the] phone is likely to contain incriminating information about a two-year-old crime").

It is critical that the Court take this opportunity to deter this artful but empty residential-search affidavit, which perpetuates the "chief evil against which … the Fourth Amendment is directed." *United States v. Lyles*, 910 F.3d 787, 793 (4th Cir. 2018) (quoting *United States v. U.S. Dist. Court (Keith)*, 407 U.S. 297, 313 (1972)).

Respectfully Submitted.

/s/ *Steven M. Klepper*
Steven M. Klepper
Bruno P. Babij
KRAMON & GRAHAM, P.A.
750 East Pratt Street, Suite 1100
Baltimore, MD 21202
(410) 752-6030
sklepper@kg-law.com
bbabij@kg-law.com

*Appointed Counsel for Appellant*

## Certificate of Compliance

I hereby certify that this brief complies with: (1) the 6,500-word type-volume limitation of Fed. R. App. P. 32(a)(7)(B), in that it contains 4,181 words, excluding the parts exempted by Fed. R. App. P. 32(f); and (2) the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportional typeface using Microsoft Word in 14-point Century Schoolbook font.

/s/ *Steven M. Klepper*
Steven M. Klepper

## Certificate of Service

I hereby certify that, on January 23, 2026, I filed this brief with the Court's CM/ECF system, which will cause copies to be served on all counsel of record.

/s/ *Steven M. Klepper*  
Steven M. Klepper
